No. 12333

IN THE SUPREME COURT OF THE STATE OF MONTANA

1973

---

CITY OF HELENA, MONTANA,
a municipal corporation,

Plaintiff and Respondent,

-vs-

ANNA MAE DeWOLF, et al.,

Defendants and Appellants.

---

Appeal from: District Court of the First Judicial District,
Honorable Peter G. Meloy, Judge presiding.

Counsel of Record:

For Appellants:

Gough, Booth, Shanahan and Johnson, Helena, Montana
Ronald F. Waterman argued, Helena, Montana
Edward Booth appeared, Helena, Montana

For Respondent:

Keller, Reynolds and Drake, Helena, Montana
Keith Keller argued, Helena, Montana
C. W. Leaphart argued, Helena, Montana

---

Submitted: March 5, 1973

Decided: MAR 2 7 1973

Filed: MAR 2 7 1973

*Thomas J. Kearney*
Clerk

Mr. Justice Wesley Castles delivered the Opinion of the Court.

This is an appeal from a preliminary order of condemnation. Plaintiff city of Helena brought this action seeking to condemn and take by eminent domain defendants' property located in the city of Helena. The trial court held a hearing on necessity and entered its preliminary order of condemnation. After exceptions were overruled, defendants appealed.

Defendants are owners of property consisting of some four lots or about 9,000 square feet, on which the Union Market operates and five stores are rented. The property fronts on Sixth Avenue. To the west and extending south lies Jackson Street, to the north and extending north is Allen Street. The east and south sides are parking lots, and across Jackson Street to the west is a building housing the State Nursery Company.

In 1967 the downtown area of the city of Helena was surveyed for a proposed Urban Renewal project pursuant to 42 U.S.C.A. §§ 1450 et.seq. Thereafter the planning process of the project began. That stage lasted eighteen months and on April 30, 1970, the plan for the Urban Renewal area was submitted to the federal government and approved. Funding was received in July 1970. By March 1972, approximately 90% of the land within the Urban Renewal area had been acquired and 45% of the buildings acquired had been demolished.

Defendants' property is within the confines of the Urban Renewal area at its northernmost boundary. The city attempted to negotiate a purchase of defendants' property without success. It then authorized condemnation proceedings.

The proposed development plan shows defendants' property is to be crossed at the northeast corner by the "new" Jackson Street. The remainder of the property is to be used for surface parking, yielding about thirty parking stalls.

Simply stated, the purpose of the Last Chance Urban Renewal plan is to revitalize the whole downtown area of the city of

Helena to make it attractive for commercial redevelopment. The development and proposed new construction is a relatively large project and involves downtown Helena from Sixth Avenue south up historic "Last Chance Gulch". At the date of the hearing in the district court the project had expended some $5,000,000 out of $9,300,000 provided. These monies have been expended and will be expended for acquisition of properties and public improvements, such as streets, sidewalks, curbs, gutters, and storm sewers. Other projects include elderly housing and a neighborhood facility building. So far, one new hotel has been constructed with private funds. The Urban Renewal agency does not itself rebuild structures. It has no funds available for rehabilitation except in certain limited classes of historic restoration and for planning grants. The Urban Renewal agency's function is to make an area attractive for private development. It performs this by consolidating land ownership, installing public improvements such as streets, sewers and curbs, and demolishing existing structures on an area basis.

The basic concept of the plan is a "shopping center" in which vehicles are separated from pedestrians. The business area would be surrounded by public streets with parking adjacent to them. The commercial area itself is located between the surrounding streets and parking areas. The shopping center analogy is descriptive in a sense. However, its development is somewhat reverse; that is, parking and streets come before business in the plan. Business, dependent entirely on private enterprise, may or may not come at all. In the overall plan the area is not being all taken nor all cleared. The properties taken are on a selective basis, the witnesses giving reasons for the taking. Some of the property was being preserved for architectural and historical significance. Some properties were shown as to rehabilitation projects. Some dilapidated properties were being kept for historical purposes. In other words, within the area, considerable picking and choosing was made for properties to be acquired.

Defendants' property was inspected and found to be lacking in meeting what were called "code standards" in some respects; but the record is clear, and the trial court found, that the necessary improvements could and would be made except for this litigation. Accordingly, we are not here concerned so far as defendants' property goes with substandard or "blighted" property. We are, however, concerned with a blighted area.

Defendants state two issues on appeal. (1) Whether the district court erred in ruling that the condemnor had established "necessity" for the take, and (2) whether the court erred in ruling that defendants failed to establish arbitrary and capricious action and abuse of discretion in the city's attempt to take the property.

We approach our discussion by conceding, as both parties do, that Urban Renewal and the proposed street and parking improvements contemplated on defendants' land are for public use. Our attention is narrowed to whether the taking of the land is necessary, and in conjunction with that, whether the proposed taking is done with the least private injury.

The trial court found specifically that "the public improvements and use to be made by Plaintiff [city] across and through Defendants' said land are located in the manner which are most compatible with the greatest public good and the least private injury".

Section 11-3902, R.C.M. 1947, expresses the legislative concern with the existence of deteriorated areas in cities. It provides:

> "It is hereby found and declared that blighted
> areas which constitute a serious and growing
> menace, injurious to the public health, safety,
> morals and welfare of the residents of the state
> exist in municipalities of the state; that the
> existence of such areas contributes substantially
> and increasingly to the spread of disease and
> crime and depreciation of property values, con-
> stitutes an economic and social liability, sub-
> stantially impairs or arrests the sound growth
> of municipalities, retards the provisions of
> housing accommodations, aggravates traffic problems

and substantially impairs or arrests the elimina-
tion of traffic hazards and the improvement of
traffic facilities; and that the prevention and
elimination of such areas is a matter of state
policy and state concern in order that the state
and its municipalities shall not continue to be
endangered by areas which are focal centers of
disease, promote juvenile delinquency, are con-
ducive to fires, are difficult to police and to
provide police protection for, and, while con-
tributing little to the tax income of the state
and its municipalities, consume an excessive
proportion of its revenues because of the extra
services required for police, fire, accident,
hospitalization and other forms of public pro-
tection, services and facilities.

"It is further found and declared that certain
of such areas, or portions thereof, may require
acquisition, clearance, and disposition subject
to use restrictions, as provided in this act,
since the prevailing condition of decay may make
impracticable the reclamation of the area by
rehabilitation; that other areas or portions
thereof may, through the means provided in this
act, be susceptible of rehabilitation in such a
manner that the conditions and evils hereinabove
enumerated may be eliminated, remedied or pre-
vented; and that to the extent feasible salvable
blighted areas should be rehabilitated through
voluntary action and the regulatory process.

"It is further found and declared that the powers
conferred by this act are for public uses and
purposes for which public money may be expended
and the power of eminent domain exercised; and that
the necessity in the public interest for the pro-
visions herein enacted is hereby declared as a
matter of legislative determination." (Emphasis
added).

Section 11-3908, R.C.M. 1947, gives municipalities the

right of eminent domain for Urban Renewal purposes. It provides

in part:

"A municipality shall have the right to acquire
by condemnation, any interest in real property,
which it may deem necessary for an urban renewal
project under this act after the adoption by the
local governing body of a resolution declaring
that the acquisition of the real property described
therein is necessary for such purpose. Condemna-
tion for urban renewal of blighted areas is declared
to be a public use, and property already devoted
to any other public use or acquired by the owner
or his predecessor in interest by eminent domain
may be condemned for the purposes of this act."

At this point, we shall digress somewhat. The power of

eminent domain expressed above in section 11-3908, R.C.M. 1947,

refers specifically to this urban renewal project. Yet, the

city, in its brief, suggests and urges that section 11-977,

- 5 -

R.C.M. 1947, the power of condemnation statute last amended in 1937 and applying generally to city and town councils, provides for a "conclusive presumption as to the necessity of taking". The city reasons that once it passes its ordinance declaring condemnation for urban renewal of blighted areas, the public use and the necessity are conclusively presumed; not under section 11-3908, but rather under section 11-977. The answer is relatively simple.

The city's only authority to condemn on an "area" basis is section 11-3908, R.C.M. 1947. It could not otherwise condemn for parking lot purposes under section 11-977, R.C.M. 1947. In section 11-3908 it is further provided that certain types of evidence are admissible during a condemnation hearing. Had the legislature intended the urban renewal's determination of necessity to be final, it would have been unnecessary to thereafter declare what evidence would be admissible at a hearing on necessity. It also contemplated that eminent domain would be exercised under the eminent domain statutes, sections 93-9901, et seq., R.C.M. 1947. Under section 93-9905, the least private injury must be considered, at least in the context of the Urban Renewal plan.

The Urban Renewal sections heretofore quoted provide not only for clearance of blighted property but go on to favor rehabilitation of areas or portions thereof. Further, those sections indicate that redevelopment is proper only when reclamation of an area by rehabilitation is impractical.

Thus, the city's contention of a conclusive presumption is not sound.

Returning now to our discussion of the record as it pertains to the finding of necessity and least private injury. Both sides concede the general use for Urban Renewal purposes is established, but the necessity of the particular use, that of parking, is challenged.

The testimony concerning the need for parking was supplied by an engineer who had made a study and projected his study into the future, if the planned development does occur. His testimony established that unless all of the buildings were built and completely occupied, the need for the 31 parking spaces which defendants' property would yield would not exist. It is also clear from the testimony that no one can say whether redevelopment will occur. No public funding is available for redevelopment.

The city argues that even though many of the public improvements contemplated and under construction are not necessary if no redevelopment occurs; conversely, it is certain that no redevelopment can occur unless those public improvements are made. That is to say, that necessarily the plan's consummation is a long term proposition.

Defendants stress these matters: First, "no one" can testify as to the extent of redevelopment. Second, the particular parking area or structure planned for the area to be condemned is not presently funded; that is, it is only a plan for the future. Third, if redevelopment does not occur, may of the public improvements will not be needed. In this connection, defendants pessimistically forecast a dismal future for downtown Helena. In their brief, they refer to it as a "planner's dream expressed in architectural drawings".

However, the city urges that the broad scope of the legislation partially quoted heretofore, and the entire urban renewal concept necessarily envisions positive, imaginative, and optimistic planning for the future.

This Court has determined necessity questions in a number of cases, mostly related to highway condemnations. In only one case has the Court specifically directed its attention to the necessity of use as distinguished from the general purpose. In State Highway Comm'n v. Yost Farm Co., 142 Mont. 239, 384 P.2d 277, the highway commission proposed to build a frontage road

along an interstate highway. At the necessity hearing the commission introduced its resolution authorizing condemnation and rested its case. The property owner introduced evidence of experts who testified the frontage road was unnecessary and that the area was adequately served by other roadways. On the basis of this evidence and lack of any evidence in favor of construction of the road, the Court denied necessity.

In the instant case, the city did not rest its case solely on the introduction of its resolution authorizing condemnation. Instead it introduced considerable evidence, both oral and documentary, in support of its Urban Renewal plan and the specific uses to be made of defendants' property. Mr. Greer, the former Urban Renewal director, testified as to the general purposes and outline of the plan and the uses to be made of defendants' property. That the area encompassed in the project was a "blighted area"; some 89% of the buildings were "deficient"; while 39% were found to be "sub-standard". Mr. Dailey, an expert traffic engineer, testified as to traffic and parking and his reasons therefor.

Mr. Dailey's testimony as to parking requirements was, other than the maps, the only evidence as to parking requirements. After discussing short-term and long-term parking requirements in terms of less than 2 1/2 hours and more than 2 1/2 hours, he also established a distance of some 250 feet a parker would travel from short term parking. He discussed the parking needs in the area of defendants' property in terms of square feet of business as related to square feet of parking needs as related to distance. He discussed these in terms of surface parking.

Another witness, a Mr. Cassidy, project director, discussed further parking studies being made on multi-floored parking structures. We observe that studying the testimony as related to the maps leaves one unimpressed with numbers of parking spaces required. The district court made no findings of fact concerning specific parking requirements; nor, as we read the record, could it have because there simply was not any clear testimony concerning such requirements.

The only basis for the district court's finding of greatest public good and least private injury, if that be a finding of fact, is the opinion of Dailey that defendants' property would be necessary to the project. As related before, this opinion was highly speculative; and did not consider further studies then in progress. The district court in its conclusions of law stated:

"The inquiry here is one of a fact determination and in this capacity this Court is commanded by the Montana Supreme Court that the decision of the City shall not be overturned except on clear and convincing proof that the taking has been excessive or arbitrary. Such clear and convincing proof that the taking is excessive or arbitrary is not present in this case."

Here, we have the city required to present proof of necessity; but, as shown above, wind up with the property owners having to prove by clear and convincing proof of lack of necessity! See discussion hereinafter of State Highway Comm'n v. Yost Farm Co., 142 Mont. 239, 384 P.2d 277.

But, in any event, we do not find sufficient credible testimony to uphold the district court's findings.

The city relied upon the general rule of law concerning Urban Renewal Acts to the effect that urban renewal is an "area" concept and so long as the city established the boundaries it did not have to prove necessity for the taking of individual properties. The city cites Berman v. Parker, 348 U.S. 26, 75 S.Ct. 98, 99 L ed 27; Anno. 44 ALR2d 1414,1416; 45 ALR3d 1054. We acknowledge the literally dozens of cases throughout the nation which hold it is sufficient that the taking as a whole is reasonably necessary to the clearance of blighted areas and prevention of their recurrence. See: Velishka v. City of Nashua, 99 N.H. 161, 106 A.2d 571. However, where it is shown, as here, that the property is not reasonably necessary to the clearance of the blighted area and prevention of its recurrence, the "area concept" does not prevail.

This brings us to the issue here---whether the taking was reasonably necessary to the clearance of blighted areas and

- 9 -

prevention of their recurrence, in particular under a statute which contemplates rehabilitation where practical. The district court found that it was necessary and did the least private injury. Did the district court abuse its discretion? Or, put another way, is the credible evidence sufficient to uphold the findings?

Defendants' property stands at the extreme edge of the project. It can be eliminated from the project without harming the balance of the project. The Urban Renewal plan can be amended for that purpose. The testimony of all witnesses admits this.

Mr. Nesbit, city construction engineer, was asked whether new Jackson Street could be moved ten feet east, thus avoiding defendants' property "without greatly interfering with the overall project". He answered that this was so. Then on further questioning, he explained it would not interfere with the with the "renewal area" but would slightly interfere with alignment of new Jackson north across Sixth Avenue and and Allen Street, but that Allen Street was not a major feeder street. He concluded that moving New Jackson Street ten feet east would not alter the effectiveness of the street in serving the area.

The "need" for defendants' property was for a parking area. Clete Dailey, the traffic engineer who made a study for the Urban Renewal plan, provided the testimony for the "need" as a parking area. Dailey made his own study and relied on other studies and forecast the need for parking. He agreed that if any of the structures shown on the projected land use map were not completed, the total demand for parking would be reduced. He also agreed that even if the proposed structures were built, they would have to be fully occupied. It is clear from Dailey's testimony that need for the parking to be supplied when defendants' property becomes available is not a present need nor a need in the reasonably foreseeable future. The need will only arise if and when the area is fully redeveloped.

Thus, the concept of necessity for a public use is a possible future necessity. Its present application is only in a "planning" sense and a step towards fulfillment of the long range plan. It is crystal clear that defendants' property is sought now to await money, motivation, and hopes of the planners.

Defendants' position is simply that the city failed to show a reasonable need with the actual, or even reasonably foreseeable, ability to complete the project for which the property is needed.

There are numerous cases in Montana involving the issue of necessity.

A recent review of the entire subject of eminent domain is found in Montana Power Co. v. Bokma, 153 Mont. 390, 397,399, 457 P.2d 769. There it was stated:

> "Before the district court may order condemnation, it must find that the proposed taking is necessary to the public use under the circumstances of the individual case. Sections 93-9905, 93-9911, R.C.M. 1947. The question of necessity is one of fact to be determined as other questions of fact in the light of all the evidence. State ex rel. Livingston v. District Court, 90 Mont. 191, 300 P. 916. Necessity does not mean absolute or indispensable necessity but reasonable, requisite, and proper for the accomplishment of the end in view, under the particular circumstances of the case. State Highway Comm. v. Yost Farm Co., 142 Mont. 239, 384 P.2d 277; Butte, A.& P. Ry. Co. v. Montana U.Ry. Co., supra.

> "* * *

> "The taking of private property by condemnation proceedings must be compatible with the greatest public good and the least private injury. Section 93-9906, R.C.M. 1947. This requirement is specifically made applicable to easements and rights-of-way. Section 93-9904(5), R.C.M. 1947. The greatest good on the one hand/and tne least injury on the other are questions of fact to be determined in passing upon the question of necessity. State ex rel. Livingston v. District Court, supra, quoted with approval in State Highway Comm. v. Yost Farm Co., supra. These questions commonly arise in connection with the location of the proposed improvement. Since the condemnor has the expertise and detailed knowledge of considerations involved in determining location of the improvement, its choice of location is given great weight. See State ex rel. Bloomington Land & Live Stock Co. v. District Court, 34 Mont. 535, 88 P. 44; State ex rel. Livingston v. District Court, supra. Such choice will not be overturned except on clear and convincing proof that the taking has been excessive or arbitrary, it not being the function of the juridiciary to determine as an engineer the

best location of the proposed improvement. State Highway Comm. v. Crossen-Nissen Co., 145 Mont. 251, 400 P.2d 283. On the other hand when the condemnor fails to consider the question of the least private injury between alternate routes equal in terms of public good, its action is arbitrary and amounts to an abuse of discretion. State Highway Comm. v. Danielsen, 146 Mont. 539, 409 P.2d 443." (Emphasis added).

The burden of demonstrating necessity rests upon the condemnor who must establish a prima facie case to justify the taking. State Highway Comm'n v. Yost Farm Co., 142 Mont. 239, 384 P.2d 277. In State Highway Comm'n v. Crossen-Nissen Co., 145 Mont. 251, 254, 400 P.2d 283, the Court stated:

"The requirement that the condemnor must show necessity for the property taken does not mean that it must be indispensable to the proposed project. Rather the word 'necessary' as used in section 93-9905 means that the particular property taken be reasonably requisite and proper for the accomplishment of the purpose for which it is sought under the peculiar circumstances of each case."

It is against this measure that the present case must be tested. Each decision cited above notes that necessity must be determined by ascertaining whether the property is reasonably needed for the accomplishment of the end in view. Involved here is not just the alleged need for parking spaces on defendants' property, but the entire development of the Urban Renewal area. While the evidence established that the parking will be needed to serve the Urban Renewal project, it establishes also that the project parking will be required only if the entire Urban Renewal project is completed. That was Mr. Dailey's testimony. He based his conclusions of the amount of parking needed upon the assumption that all of the projects on the Urban Renewal land use map would be built and filled with the number of tenants projected by the Urban Renewal department. Clearly, the necessity for parking must be measured against the reasonable probability of the success of the Urban Renewal development. The parking need is completely interwoven with the redevelopment of downtown Helena.

This case is exceptional for the reason that to establish reasonable necessity the city of Helena must show not only the amount of parking needed, but also the probability that the structures which the parking is designed to serve will be constructed. Otherwise, the only limitation upon the amount of property that could be acquired for Urban Renewal parking projects is the architect's imagination.

We conclude that "necessity" must be shown as a reasonable need with foreseeable ability to complete. Under the facts of this case we do not find a showing of reasonably foreseeable ability to complete. Defendants' going business would be destroyed, the property acquired, and simply held for that indefinite future when it just might be needed. It is not then reasonably necessary to the clearance of the blighted area and prevention of its recurrence. Under this reasoning, the district court did not have substantial credible evidence to support its findings and particularly its conclusion of law that the taking was necessary.

Accordingly, the preliminary order of condemnation is reversed.

_Wesley Castles_
Associate Justice

We Concur:

_James T. Harrison_
Chief Justice

_Gene B. Daly_

Associate Justices

_Arthur B. Martin_
Hon. Arthur Martin, District
Judge, sitting for Associate
Justice John Conway Harrison.

Mr. Justice Frank I. Haswell specially concurring:

I concur in the result.

_Frank I. Haswell_
Associate Justice

- 13 -