AAAA ENTERPRISES, INC., Appellant,

v.

RIVER PLACE COMMUNITY URBAN REDEVELOPMENT
CORPORATION et al., Appellees.

[Cite as *AAAA Enterprises, Inc. v. River Place Community
Urban Redevelopment Corp.* (1991), 74 Ohio App.3d 170.]

Court of Appeals of Ohio,
Franklin County.

No. 90AP–1421.

Decided on May 16, 1991.

*Ronald B. Noga,* for appellant.

*Ronald J. O'Brien,* City Attorney, *James Fais,* City Prosecutor, and *Marvin E. Rothaar,* for appellee city of Columbus.

*Vorys, Sater, Seymour & Pease* and *Bruce L. Ingram,* for *amicus curiae* River Place Community Urban Redevelopment Corp.

---

JOHN C. YOUNG, Judge.

This matter is before this court upon the appeal of appellant AAAA Enterprises, Inc. ("AAAA") from a directed verdict in favor of appellees, River Place Community Urban Redevelopment Corporation et al. ("River Place").[1]

---

1. In prior proceedings, River Place was dismissed as a party and James Triplett, current owner, was substituted as the party-plaintiff.

In June 1985, AAAA, a landowner, filed a declaratory judgment action against the city of Columbus ("city"), asserting that an area surrounding the location of its building, an apartment and rooming house, was not a blighted area as determined by Resolution 135X–80, passed by city council in 1980. The city council passed this resolution declaring the city of Columbus an "impacted city," as defined by R.C. 1728.01(C), and the area located between Front Street on the east, Civic Center Drive on the west, Rich Street on the north, and Main Street on the south ("the project area") as a "blighted area" as defined in R.C. 1728.01(E).

Pursuant to R.C. Chapter 1728 and Resolution 135X–80, the city of Columbus and River Place entered into an agreement. The city was required to acquire property through the exercise of its eminent domain power and to sell the property to River Place. River Place would then develop the area into commercial, public or residential areas. The funding for the acquisition of property was to be provided by River Place, or some other third party. Thus, in its lawsuit, appellant also sought an injunction to prevent the city from acquiring the property through its eminent domain powers.

The city filed a motion for summary judgment, which was granted. The matter was appealed to this court, and this court reversed the trial court and remanded the matter. That decision was appealed to the Supreme Court. In its decision, *AAAA Enterprises, Inc. v. River Place Community Urban Redevelopment Corp.* (1990), 50 Ohio St.3d 157, 553 N.E.2d 597, the Supreme Court affirmed this court and held that the proper standard for judicial review of a city council's determination that an area is a "blighted area" for purposes of R.C. Chapter 1728 and for the purpose of the exercise of the city's power of eminent domain is an abuse of discretion standard. *AAAA Enterprise, Inc., supra,* at paragraph one of the syllabus.

Subsequently, a trial on the merits began in Franklin County Common Pleas Court. At the close of plaintiff's case, appellee moved for a directed verdict. The trial court granted this motion and ordered the case to be dismissed. Thereafter, appellant filed the following three assignments of error:

"The Trial Court erred in holding Plaintiff–Appellant had failed to meet its burden of proving no sound reasoning process existed by which the City of Columbus cold [*sic*] have determined the project area was blighted as defined in R.C. 1728.01(E)."

"The Trial Court's holding that Plaintiff–Appellant had failed to meet is [*sic*] burden of proof was against the manifest weight of the evidence.

"The trial court erred in holding that there is no legal prohibition for a city to use its power of eminent domain to facilitate the transfer of private property from one private interest to another private interest favored by the City."

In the first assignment of error, appellant asserts that the trial court erred in holding that appellant had failed to meet its burden of proving no sound reasoning process existed by which the city could have determined that the project area was "blighted" as defined by R.C. 1728.01(E).

R.C. 1728.01(E) provides:

" 'Blighted area' means an area within a municipality containing a majority of structures that have been extensively damaged or destroyed by a major disaster, or that, by reason of dilapidation, deterioration, age or obsolescence, inadequate provision for ventilation, light, air, sanitation, or open spaces, unsafe and unsanitary conditions or the existence of conditions which endanger lives or properties by fire or other hazards and causes, or that, by reason of location in an area with inadequate street layout, *incompatible land uses or land use relationships*, overcrowding of buildings on the land, excessive dwelling unit density, or other identified hazards to health and safety, are conducive to ill health, transmission of disease, juvenile delinquency and crime and are detrimental to the public health, safety, morals and general welfare." (Emphasis added.)

A "blighted area" is a section of real estate that is in the process of deterioration and where development has become stagnant and unproductive. The courts have liberally construed legislation defining "blighted area" since the meaning of urban renewal legislation is political in nature, involving questions of public policy. A "blighted area" is to be distinguished from a "slum area." A "slum area" is inferior housing beyond repair, whereas a "blighted area," although it may include individual buildings and parcels in good condition, is marked by its lack of growth, deterioration, and declining property values. Defining a "blighted area" is something more than deteriorated structures; it involves an evaluation of whether the land is being used in the best and most efficient manner in relationship to the surrounding area. See, generally, Annotation (1972), 45 A.L.R.3d 1096.

Lawmakers realized that where an area was plagued by stagnant growth, various conditions and individual ownership of title stood in the way of unified

development. Consequently, urban renewal and community development programs are a cooperative effort between government and private enterprise for redevelopment of decaying areas. The government contributes its power of eminent domain to assemble the individual parcels of land. Redevelopment is then performed by private enterprise with economic incentives provided by the government. Thus, the purpose is a comprehensive and coordinated effort to eliminate conditions causing social and economic liability and to redevelop areas to serve the best interests of the community.

█ In the instant case, a field survey, Joint Exhibit 9, was conducted by the city's Department of Development. The field survey details each building and parcel and depicts a lack of landscaping and a lack of adequate lighting in the project area. The field survey demonstrated that thirty-four percent, or three of the nine buildings, in the project area were blighted, and forty-four percent of the parking area was blighted. The project area is a composite of nine buildings which are scattered over an area consisting of sixty-nine percent parking lot. Although six of the buildings were reportedly in good condition, three buildings were in poor maintenance. The trial court noted in its decision that the findings of the field survey met the criteria for the Department of Housing and Urban Development ("HUD") and the HUD Urban Renewal Handbook. The trial court found it reasonable for the city council to rely upon this federal standard in evaluating whether the project area was a "blighted area."

The field survey also details the incompatibility of the land use in the project area. First of all, the scattered placement of the buildings throughout the project area inhibits any comprehensive type of development. Furthermore, sixty-nine percent of the project area is being used as flat surface parking rather than using the more efficient method of a parking garage. Moreover, in regard to land use relationships, it was not unreasonable for city council to determine that the best and most efficient use of this land was not flat surface parking, given the surrounding area.

Although the trial court stated that it did not necessarily agree that the project area was blighted, in applying the abuse of discretion standard as set forth in *AAAA Enterprises, Inc., supra,* the trial court concluded that city council exercised reasonable discretion in concluding that the project area was blighted. Upon review, this court is inclined to agree. It was reasonable for city council to rely upon the information in the field survey, which comported with federal standards, to conclude that the project area was a blighted area pursuant to R.C. 1728.01(E). Although the project area was not in a state of

deterioration beyond repair, city council evaluated the incompatibility of the land uses within the project area and the land use as it related to the surrounding area. Using a majority of the land for flat surface parking was not the best and most efficient use of the land, which would otherwise be useful and valuable and contribute to the public interest. See *Levin v. Twp. Commt. of Bridgewater* (1971), 274 A.2d 1, 57 N.J. 506. Surrounding areas, which in recent years have been developed, include the Columbia Gas Building, the Brewery District, Capital South, which includes the City Center Mall,[2] the new court complex, Bicentennial Park and the Waterford Towers. It was reasonable for city council to conclude in 1980 that the project area was a "blighted area" and the public interest would best be served by the unified, comprehensive redevelopment of a more efficient use for the land, particularly in light of the city's rapid growth in population and overall development in the last two decades. Accordingly, appellant's first assignment of error is not well taken and is overruled.

In appellant's second assignment of error, it is asserted that the trial court's holding that appellant failed to meet its burden of proof is against the manifest weight of the evidence. Appellant asserts that since the appellee's own field survey demonstrated that a majority of the structures (six of nine) in the project area were standard and a majority of the parking lot space was standard, the city's determination that the project area was blighted was not made under a sound reasoning process and, thus, was against the manifest weight of the evidence. See *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 10 OBR 408, 461 N.E.2d 1273. In reviewing the evidence to determine whether appellant met its burden in the context of appellee's motion for a directed verdict pursuant to Civ.R. 50(A)(4), reasonable minds could come to but one conclusion upon the evidence submitted, and that conclusion is that appellant's evidence was insufficient to prove that city council had abused its discretion in concluding that the project area was a "blighted area." See *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578.

As previously discussed, the evaluation of whether a certain area is blighted is not determined by a parcel-by-parcel or structure-by-structure analysis. A "blighted area" is distinctive because of its lack of growth, deterioration, and declining property values, even though it may include individual structures or buildings in standard or better condition. However, the determination as to

---

**2.** This area of downtown was predominantly flat surface parking before it was developed.

whether a certain area constitutes a blighted area also involves an evaluation as to incompatible land uses or land use relationships as set forth in R.C. 1728.01(E). Upon review of the evidence, there is little, if any, evidence offered by appellant regarding land use relationship and compatibility. The trial court, in its decision, commented as follows:

"The evidence before the court are the testimony of two people, one being the son of a property owner, and the other being a property owner in this area.

"The testimony of the son is such that he has no real background or training in real estate. His testimony regarding the appearance of the property was very vague, at best. And the court, in reviewing its notes, could find 'such as appeared sound.' However, there was no interior examination of the buildings, no clear descriptions to the court of any of the condition of the buildings, other than much generalities.

"The testimony of the property owner himself was even more general than that of his son and provided little guidance to the court on which to base any conclusions.

"There was no expert testimony presented, no objective outside person to do an analysis, a survey, an appraisal. There was no testimony regarding land use, its compatibility of land use, reasonableness of the relationship of land use to surrounding areas outside of the project area or otherwise.

"The court must weigh this testimony against the evidence that has been presented in the joint exhibit, which is, basically, the field survey. The field survey was conducted by a development department employee with architectural training and similar survey background. It is far more concise, far more detailed, and in this court's mind far more credible. It provides this court much more detail upon which to analyze and judge the city council's determinations. It places an evaluation of 34 percent of the buildings blighted, and 44 percent of the parking blighted.

"The opinions presented by father and son were too nonspecific for the court to evaluate what percentages they were trying to present.

"The survey also presents that 69 percent of the parking—69 percent of the property is parking. The survey presents other details for the court's consideration, which concerns the lack of landscaping, lack of lighting, some buildings are rated good and some buildings are rated poor in maintenance. But, anyhow, it presents a much greater wealth of material for the court to review.

"In addition, the findings of the survey met the HUD criteria and the HUD urban renewal handbook, which the court finds reasonable for city council to rely upon as a federal standard in evaluating whether there is a blight in the area.

"In addition, the survey provides some information to the court regarding the incompatibility of the land use of 69 percent parking in an area that is already heavily parking only, and it is, perhaps, not compatible with best use of downtown development.

"In reviewing the detail itself, the court finds lots of specific potential problems in reviewing the map, and it is very difficult to see how the area could be developed with the odd placement of the buildings on the property. There is much use of parking in just flat surface parking, rather than, perhaps, the more efficient use of a parking garage.

"In going back to the standards set out in Section 1728.02, the court finds that the purpose of a community urban redevelopment corporation is to initiate and conduct projects for the development of blighted areas to serve a public purpose.

"To look at this purpose and to look at this reason, the plaintiff has provided no evidence, other than the simple condition of the buildings, which has been scanty evidence, at best.

"There has been no evidence to refute council's consideration of a master plan for redevelopment of downtown Columbus, council's consideration of compatible land uses in relation to other parking lots. There is no finding that parking lots per se are bad, but the use of parking lots in relationship to other areas in Columbus is the consideration. There is no basis upon which the court can review council's reasoning process in considering the survey.

"While the court itself may not necessarily agree that this area is blighted, there is certainly no evidence to refute council's use of discretion in this matter.

"Council reached a conclusion in its resolution in which it found the area blighted. Resolution 135X–80, the council determined that the area (A) had conditions of blight and conditions of blight and deterioration exist in this area. (B) 'This area is a blighted area as defined in and contemplated by Chapter 1728, Ohio Revised Code.'

"(C) 'This blighted area contains a majority of structures which by reason of location in an area with incompatible land uses or land use relationships, or other identified hazards to health and safety are conducive to ill health, transmission of disease, juvenile delinquency and crime and are detrimental to the public health, safety, morals, and general welfare.'

"And (D) 'The city of Columbus is an impacted city, as designated by the state of Ohio and contemplated by Chapter 1728, Ohio Revised Code.'

"In reaching that conclusion, the court finds that there was a rational reasoning process to support their conclusions of blight, incompatibility of land use and incompatibility of land use relationships. Unfortunately, the plaintiff must carry the burden of proof to establish that such was not so, and the plaintiff simply failed to meet this burden of proof.

"Therefore, the court concludes that reasonable minds cannot differ, but that city council exercised reasonable discretion in making its conclusion of a blighted area." (Excerpt from Transcript of Proceedings at pages 198–202.)

The testimony of appellant and his son is basically a commentary on the apparent condition from a visual perspective of each parcel and building in the project area as it existed in 1980. There is no detailed analysis of the structural condition of the buildings as they existed in 1980, no expert testimony to refute the conclusions of Joint Exhibit 9, the field survey, and no testimony regarding land use incompatibility and relationships.

Based on the foregoing, appellant's second assignment of error is not well taken and is overruled.

■ In the third assignment of error, it is appellant's contention that the trial court erred in holding that there is no legal prohibition against a city's use of its power of eminent domain to facilitate the transfer of private property from one private interest to another private interest favored by the city. Appellant asserts that property in the project area is being acquired, under the threat of eminent domain, by private interests that have no legal obligation to develop the property in accordance with the agreement between the city and River Place. The trial court thoroughly analyzed the acquisition of property by Schottenstein Realty and ENBE, Inc. ("ENBE") and their relationship to River Place Community Urban Redevelopment Corporation. Bernard Schottenstein ("Schottenstein"), who testified at trial, is President of River Place and owns fifty percent of the corporation. He and his wife own the ENBE holding company and two of his cousins are Schottenstein Realty.[3] It was Schottenstein's testimony at trial that he fully intends to develop the property pursuant to the agreement with the city and abide by Chapter 1728.

Appellant has objected to land in the project area being acquired by ENBE and Schottenstein Realty under allegations of the threat of eminent domain. The only evidence to remotely substantiate this allegation was the testimony

---

3. Property is acquired by Schottenstein Realty through Zenith Holding and Trading Company.

of Schottenstein regarding the sale of the Schaaf property. However, the record indicates that the Schaaf property was eventually acquired through a private sale. Since there has been no incident of the city relying upon its power of eminent domain to facilitate the sale of property from one private interest to another, appellant's allegation is unfounded, and premature at best. Accordingly, this court affirms the trial court's finding on this issue and overrules appellant's third assignment of error.

Based on the foregoing, appellant's first, second and third assignments of error are not well taken and are overruled. The judgment of the Franklin County Court of Common Pleas is affirmed.

*Judgment affirmed.*

PEGGY BRYANT and PETREE, JJ., concur.