RONALD R. FITZKE AND DELORES FITZKE, HUSBAND AND WIFE, APPELLEES, V. CITY OF HASTINGS, NEBRASKA, A MUNICIPAL CORPORATION, AND COMMUNITY REDEVELOPMENT AUTHORITY OF THE CITY OF HASTINGS, NEBRASKA, APPELLANTS, AND ELMER HOHLEN AND COLLEEN HOHLEN, HUSBAND AND WIFE, AND MARC HULTINE, APPELLEES.

582 N.W. 2d 301

Filed July 17, 1998.    No. S-96-787.

Bradley J. White, of Helmann, Sullivan & White, P.C., for appellants.

Arthur R. Langvardt, of Langvardt & Valle, for appellees Fitzke.

WHITE, C.J., CAPORALE, WRIGHT, CONNOLLY, GERRARD, STEPHAN, and McCORMACK, JJ.

STEPHAN, J.

In this equity action, the City of Hastings, Nebraska (Hastings), and the Community Redevelopment Authority of the City of Hastings (Authority) appeal from a judgment

entered by the district court for Adams County declaring certain actions taken by them to be invalid and void under Nebraska's Community Development Law (CDL), Neb. Rev. Stat. § 18-2101 et seq. (Reissue 1991 & Cum. Supp. 1994). Hastings and the Authority contend that the court erred in concluding that Ronald R. Fitzke and Delores Fitzke had standing to challenge their actions and that the court also erred in resolving the merits of the controversy. We conclude that the district court did not abuse its discretion or make an error of law and, therefore, affirm the judgment of the district court.

## FACTUAL AND PROCEDURAL BACKGROUND

Hastings is a city of the first class located in Adams County, Nebraska. The Fitzkes own and reside on a 5-acre tract of land in Hastings. The Authority is a public corporation formed by Hastings pursuant to the CDL for the purpose of exercising the powers and functions authorized under the statutes. Such powers include the recommendation and implementation of plans to redevelop areas of a city which have been declared blighted or substandard and contracting with public or private entities in order to carry out such redevelopment plans.

In March 1993, a consultant retained by the Authority prepared a "Blight and Substandard Determination Study" for an irregular parcel of real estate designated "Hastings Redevelopment Area Number 7" (Area 7) located within Hastings. Pursuant to this study, Hastings declared Area 7 blighted and substandard, as those terms are defined in the CDL, and approved a redevelopment plan for the area. The plan stated that an area in the northernmost portion of Area 7 "should be reserved for future commercial development" but did not list any specific projects.

In late 1993 or early 1994, Marc Hultine approached Hastings officials regarding his plan to develop a campground on a privately-owned, undeveloped parcel of property in the northern part of Hastings which was being used as a cornfield. The proposed campground site was located east of the northernmost portion of Area 7 and approximately two to three blocks west of the Fitzkes' home. In April 1994, Hastings granted Hultine's request to rezone the proposed campground

site and preliminarily approved a conditional use permit to operate the campground.

Resolution No. 1994-56 was placed on the agenda for a meeting of the Hastings City Council scheduled for April 25, 1994. The resolution proposed that a 58-acre tract which included the campground site be declared blighted and substandard. In an "Agenda Item Summary Sheet" pertaining to this resolution, the city attorney stated:

> The [Authority] has indicated an interest in assisting the developer of a new KOA campground. The campground is near [Area 7], but is not currently within the bounds of that area. In order to amend the plan and include the proposed development, it will be necessary to have the area declared as blighted and substandard.

Before any action was taken on this resolution, the Authority asked the consulting firm which had prepared the 1993 blight and substandard study pertaining to Area 7 to conduct a similar study of an enlarged Area 7, which included all of the land included in the 1993 study plus the 58-acre cornfield on which Hultine proposed to build a campground. The consultant from the firm concluded that the additional land had "characteristics of some blight and substandard factors," but he did not make any independent analysis of whether it was itself blighted or substandard and stated that it was "very much possible" that it was not. The consultant recommended that the additional area be included in Area 7 in order to "create more of an overall redevelopment area for different opportunities for development." A revised redevelopment plan submitted by the consultant in conjunction with his revised blight and substandard study specified that the area added to Area 7 "should be designed for commercial and medium density residential" with open space to "be provided for recreation and to mitigate flood potential." The Hastings City Council passed resolution No. 1994-56 on August 22, 1994, determining it to be "in the best interest of the City" to declare the expanded Area 7 as blighted and/or substandard. The Authority adopted the revised redevelopment plan on August 25, and it was approved by the Hastings City Council on October 24.

On November 22, 1994, a public hearing was held on a request by the Authority to modify the Area 7 redevelopment plan to specifically provide for the development of a campground located in the area which had been added to Area 7 by the adoption of resolution No. 1994-56. The revised development plan approved by the city council on December 12 provided that Hultine would obtain a franchise from Kampgrounds of America to operate a facility for parking approximately 85 recreational vehicles, and as an incentive for this development, the Authority would grant to Hultine $94,000, which the Authority would borrow from a bank and repay through tax increment financing. In this plan modification document, a belief was expressed that the campground "will have the effect of removing blight, retain and create jobs," and generate tax revenues in the future. It further stated that the modification was "found to be reasonable and in conformity with the general plan for the development of the City as a whole, and the Plan, as amended and modified, is in conformity with the legislative declaration and determinations set forth in Neb. Rev. Stat. [§] 18-2101 et seq."

On December 29, 1994, the Authority entered into a redevelopment contract with Hultine and the individuals who owned the site of the proposed campground. The contract provided for the construction of the campground at a cost of approximately $460,000, and further provided for the $94,000 grant to Hultine.

The Fitzkes and several other parties filed this action in the district court for Adams County against Hastings, the Authority, Hultine, and the owners of the land on which the campground was to be located. Their third amended petition filed on October 4, 1995, included three separately designated "causes of action." In their first cause of action, they prayed that certain rezoning actions and amendments to Hastings' comprehensive plan pertaining to the campground be declared unlawful and void. In their second cause of action, they sought to have the conditional use permit issued with respect to the campground declared unlawful and void and to enjoin Hultine and the property owners from utilizing the land for the purposes authorized by the permit. In their third cause of action, the Fitzkes and the other plaintiffs challenged the inclusion of the campground site

in Area 7 as "contrary to law and . . . unconstitutional special legislation for private benefit." They requested a determination that the inclusion be declared unlawful and void and that the grant to Hultine be refunded and the related indebtedness retired. Hastings and the Authority generally denied the substantive allegations of the Fitzkes' third cause of action and alleged a failure to state facts sufficient to constitute a cause of action.

A bench trial, limited by stipulation of the parties to the issues raised in the third cause of action, was held on April 8 and 9, 1996. The court sustained a motion to dismiss all plaintiffs except the Fitzkes. Immediately following the trial, the district court entered a directed verdict for the owners of the proposed campground property. Hultine's motion for directed verdict and the Fitzkes' prayer for relief were taken under advisement. On June 26, the district court entered an order containing the following findings:

1. The motion of Marc Hultine for dismissal as to him should be overruled.

2. The Plaintiffs have standing to bring this action.

3. The Plaintiffs have stated a proper cause of action.

4. Land may not be added to an existing redevelopment area unless it is established that the additional land is itself blighted or substandard. The designation of the adjacent land added to [Area 7] as blighted and substandard was arbitrary and capricious and was not supported by sufficient evidence.

5. Unless necessary to relieve blight or substandard conditions on a specific site the mere incorporation of land into a redevelopment area is not sufficient to qualify the land for a blight or substandard designation. There is no showing that the proposed development would eliminate any identifiable blight or substandard condition.

6. The blighted and substandard designation of the expanded [Area 7] is contrary to the specific limitations of the relevant statutes of the State of Nebraska and is invalid.

7. The redevelopment contract entered into between Marc Hultine and the [Authority] should be rescinded and declared void from its inception.

Based upon these findings, the district court declared resolution No. 1994-56 invalid and declared the redevelopment contract between the Authority and Hultine to be "void from its inception and . . . rescinded."

Hastings and the Authority appealed, and we removed the case to our docket on our own motion pursuant to our authority to regulate the caseloads of the Nebraska Court of Appeals and this court.

## ASSIGNMENTS OF ERROR

Hastings and the Authority allege that the district court erred in its findings stated above in paragraphs numbered two through seven.

## ANALYSIS

### APPELLATE JURISDICTION

The record reflects and the parties confirmed during oral argument that there are pending issues in this action which were not resolved by the order from which this appeal is taken. Before reaching issues presented for review, an appellate court has the duty to determine whether it has jurisdiction over the matter before it. *Bonge v. County of Madison*, 253 Neb. 903, 573 N.W.2d 448 (1998). Therefore, we address the question of whether the order we are asked to review was final and appealable.

Resolution of this issue depends upon whether the first, second, and third causes of action are, in fact, separate causes of action or merely alternative theories of recovery. Where multiple causes of action are alleged, an entry of judgment on one cause of action is a final, appealable order with respect to that cause of action, despite the pendency of other causes of action in the same suit. See, *Tess v. Lawyers Title Ins. Corp.*, 251 Neb. 501, 557 N.W.2d 696 (1997); *Interholzinger v. Estate of Dent*, 214 Neb. 264, 333 N.W.2d 895 (1983). A cause of action consists of the fact or facts which give one a right to judicial relief against another; a theory of recovery is not itself a cause of action. *Olsen v. Olsen*, 248 Neb. 393, 534 N.W.2d 762 (1995); *Hoiengs v. County of Adams*, 245 Neb. 877, 516 N.W.2d 223 (1994). Whether more than one cause of action is stated depends mainly upon whether more than one primary right or subject of

controversy is presented and also upon whether recovery on one ground would bar recovery on the other, whether the same evidence would support the different counts, and whether separate actions could be maintained for separate relief. *Olsen v. Olsen, supra; Hoiengs v. County of Adams, supra.*

Although all of the Fitzkes' allegations address some aspect of the campground development, each of their designated causes of action challenges separate and distinct governmental action and seeks different relief. The first cause of action seeks declaratory relief with respect to rezoning and amendments to Hastings' comprehensive plan; the second seeks declaratory and injunctive relief with respect to a conditional use permit; and the third seeks similar relief with respect to the blight determination, redevelopment contract, and grant to Hultine. The parties are not the same in each cause of action, and each involves at least some operative facts which are distinct from the others. Therefore, the Fitzkes have pled separate causes of action rather than different theories of recovery, and the judgment as to the third cause of action was a final order which we may properly review.

## STANDING

In their first assignment of error, Hastings and the Authority challenge the district court's finding that the Fitzkes had standing to bring this action. The Fitzkes contend that they have standing as resident taxpayers and owners of property located in the vicinity of the area which Hastings has determined to be blighted and substandard. Before a party is entitled to invoke a court's jurisdiction, that party must have standing to sue, which involves having some real interest in the cause of action; in other words, to have standing to sue, a plaintiff must have some legal or equitable right, title, or interest in the subject matter of the controversy. *Ponderosa Ridge LLC v. Banner County*, 250 Neb. 944, 554 N.W.2d 151 (1996); *Metropolitan Utilities Dist. v. Twin Platte NRD*, 250 Neb. 442, 550 N.W.2d 907 (1996); *In re Interest of Archie C.*, 250 Neb. 123, 547 N.W.2d 913 (1996).

We have held that a taxpayer, for the benefit of a municipal or public corporation, may commence and prosecute to judgment an equitable action to enforce a right of action which the governing body has refused to enforce. *Professional Firefighters of Omaha v. City of Omaha*, 243 Neb. 166, 498

N.W.2d 325 (1993); *Nebraska Sch. Dist. No. 148 v. Lincoln Airport Auth.*, 220 Neb. 504, 371 N.W.2d 258 (1985). A resident taxpayer may invoke the interposition of a court of equity to prevent the illegal disposition of money of a municipal corporation or the illegal creation of a debt which he or she, in common with other property holders, may otherwise be compelled to pay. *Professional Firefighters of Omaha v. City of Omaha, supra*; *Nebraska Sch. Dist. No. 148 v. Lincoln Airport Auth., supra*. A resident taxpayer, without showing any interest or injury peculiar to itself, may bring an action to enjoin the illegal expenditure of public funds raised for governmental purposes. *Professional Firefighters of Omaha v. City of Omaha, supra*. To assert standing, a resident taxpayer must allege a demand made upon the municipal or public corporation and a refusal by the corporation to bring the action itself, or facts which show that such a demand would be useless. *Professional Firefighters of Omaha v. City of Omaha, supra*; *Nebraska Sch. Dist. No. 148 v. Lincoln Airport Auth., supra*; *Sesemann v. Howell*, 195 Neb. 798, 241 N.W.2d 119 (1976).

The record establishes that the Fitzkes pay taxes to Hastings and the Authority. Although they did not allege the making of a demand upon Hastings or the Authority to bring this action, they did allege that resolution No. 1994-56 was adopted by the Hastings City Council over their objection. They also adduced evidence establishing that Ronald Fitzke and his attorney appeared at the city council meeting on November 22, 1994, and unsuccessfully asserted objections to the proposed modification of the redevelopment plan for Area 7 to permit development of the campground assisted by tax increment financing. This evidence, and the fact that the Authority subsequently entered into the challenged redevelopment contract with Hultine, notwithstanding the Fitzkes' objections, establishes that it would have been useless for the Fitzkes to make a demand upon Hastings or the Authority to bring this action. Therefore, the district court correctly held that the Fitzkes had standing.

## STANDARD OF REVIEW

The CDL contains no provision for judicial review of actions taken pursuant thereto by cities or community redevelopment authorities. Hastings and the Authority argue that such review

should be limited and that courts should not substitute their judgment for that of the governing body of the municipal entity. Most courts which have addressed this issue under similar statutes have held that courts should defer to the findings of such municipal entities and overturn their decisions only if they are arbitrary and capricious or exhibit bad faith. *Benevolent & Protective Order of Elks, Lodge No. 65 v. Planning Board of Lawrence*, 403 Mass. 531, 531 N.E.2d 1233 (1988); *Tierney v. Planned Indus. Expansion Auth.*, 742 S.W.2d 146 (Mo. 1987); *Miller v. Tacoma*, 61 Wash. 2d 374, 378 P.2d 464 (1963); *St. Peter's v. Urban Red. Auth. of Pgh.*, 394 Pa. 194, 146 A.2d 724 (1958); *Tucson Community Dev. v. City of Tucson*, 131 Ariz. 454, 641 P.2d 1298 (Ariz. App. 1981) (citing cases in other jurisdictions holding similarly).

We analyzed the scope of judicial review of actions taken by a municipality in *Bowman v. City of York*, 240 Neb. 201, 482 N.W.2d 537 (1992), which involved a statutory right of appeal to the district court from a zoning variance granted by a city's board of adjustment. We concluded that "a district court may disturb a decision of such a board only if . . . the decision was illegal or is not supported by the evidence and is thus arbitrary, unreasonable, or clearly wrong." *Id.* at 210-11, 482 N.W.2d at 544. Next, we addressed the scope of appellate review of the district court's decision, holding that

the appellate court is to decide if, in reviewing a decision of a board of adjustment, the district court abused its discretion or made an error of law. Where competent evidence supports the district court's factual findings, the appellate court will not substitute its factual findings for those of the district court.

*Id.* at 211, 482 N.W.2d at 544. See, also, *Barrett v. City of Bellevue*, 242 Neb. 548, 495 N.W.2d 646 (1993) (reaffirming *Bowman* standard of review in appeal of board of adjustment decision). We have applied the *Bowman* standard in other contexts involving judicial review of actions taken by a municipality. See, e.g., *Kuhlmann v. City of Omaha*, 251 Neb. 176, 556 N.W.2d 15 (1996) (reaffirming that zoning board of appeals' decision may be reviewed by district court, but court's review is limited to legality or illegality of board's decision); *Stratbucker*

*Children's Trust v. Zoning Bd. of Appeals*, 243 Neb. 68, 497 N.W.2d 671 (1993) (appeal of decision of zoning board of appeals).

The *Bowman* standard is consistent with the deference which other courts have afforded to decisions of municipalities in reviewing actions taken pursuant to community redevelopment statutes. We conclude that while this case does not involve a statutory right of appeal, it is reasonable and logical to apply the *Bowman* standard. Thus, we hold that in considering a challenge to actions taken by a community redevelopment authority (CRA) pursuant to the CDL, a district court may disturb the decision of a CRA only if it determines that the decision was illegal or is not supported by the evidence and is thus arbitrary, unreasonable, or clearly wrong. On appeal, we must determine whether the district court abused its discretion or made an error of law, and we will not substitute our factual findings for those of the district court which are supported by competent evidence.

### VALIDITY OF BLIGHT/SUBSTANDARD DETERMINATION, REDEVELOPMENT CONTRACT, AND GRANT

We consider the remaining assignments of error together, as they all involve assertions that the district court misconstrued or misapplied provisions of the CDL.

We are guided by the well-settled rule that

> " 'a municipal corporation "possesses, and can exercise, the following powers, and no others: First, those granted in express words; second, those necessarily or fairly implied in or incident to the powers expressly granted; third, those essential to the declared objects and purposes of the corporation—not simply convenient, but indispensable." ' "

(Emphasis omitted.) *Giger v. City of Omaha*, 232 Neb. 676, 688, 442 N.W.2d 182, 192 (1989) (quoting *Jacobs v. City of Omaha*, 181 Neb. 101, 147 N.W.2d 160 (1966), citing *Christensen v. City of Fremont*, 45 Neb. 160, 63 N.W. 364 (1895)). Statutes granting powers to municipalities are to be strictly construed, and where doubt exists such doubt must be resolved against the grant. *Jacobs v. City of Omaha, supra.* Statutory interpretation is a matter of law in connection with which an appellate court has an obligation to reach an indepen-

dent, correct conclusion irrespective of the determination made by the court below. *Abboud v. Papio-Missouri River NRD*, 253 Neb. 514, 571 N.W.2d 302 (1997); *Bank of Papillion v. Nguyen*, 252 Neb. 926, 567 N.W.2d 166 (1997).

The CDL was enacted on the basis of the following legislative findings:

> [T]here exist in cities of all classes and villages of this state areas which have deteriorated and become substandard and blighted because of the unsafe, insanitary, inadequate, or overcrowded condition of the dwellings therein, or because of inadequate planning of the area, or excessive land coverage by the buildings thereon, or the lack of proper light and air and open space, or because of the defective design and arrangement of the buildings thereon, or faulty street or lot layout, or congested traffic conditions, or economically or socially undesirable land uses.

§ 18-2102. The Legislature further determined:

> The elimination of such conditions and the acquisition and preparation of land in or necessary to the renewal of substandard or blighted areas and its sale or lease for development or redevelopment in accordance with general plans and redevelopment plans of communities and any assistance which may be given by any state public body in connection therewith are public uses and purposes for which public money may be expended and private property acquired.

*Id.* In general, the CDL authorizes a city to create by ordinance a CRA for the purpose of defining and acquiring substandard or blighted areas and redeveloping them in accordance with the approved redevelopment plan, which in turn shall conform to the general plan for the municipality as a whole. See *Monarch Chemical Works, Inc. v. City of Omaha*, 203 Neb. 33, 277 N.W.2d 423 (1979). The CDL defines "redevelopment plan" as

> a plan, as it exists from time to time for one or more community redevelopment areas, or for a redevelopment project, which plan (a) shall conform to the general plan for the municipality as a whole; and (b) shall be sufficiently complete to indicate such land acquisition, demolition and removal of structures, redevelopment, improvements, and

rehabilitation as may be proposed to be carried out in the community redevelopment area, zoning and planning changes, if any, land uses, maximum densities, and building requirements.

§ 18-2103(13). A CRA is not authorized to prepare a redevelopment plan for a redevelopment project area unless the governing body of the city first enacts a resolution declaring such area to be "a substandard or blighted area in need of redevelopment." § 18-2109. After such a declaration has been made and a redevelopment plan has been prepared and approved, a CRA is authorized

> to enter into contracts with redevelopers of property containing covenants, restrictions, and conditions regarding the use of such property for residential, commercial, industrial, or recreational purposes or for public purposes in accordance with the redevelopment plan and such other covenants, restrictions, and conditions as the [CRA] may deem necessary to prevent a recurrence of substandard or blighted areas . . . and to provide grants, loans, or other means of financing to public or private parties in order to accomplish the rehabilitation or redevelopment in accordance with a redevelopment plan.

§ 18-2107(4). The CRA may utilize tax increment financing to pay for redevelopment projects undertaken pursuant to the CDL. § 18-2124.

As a general rule, statutes similar to the CDL have been interpreted as applying to areas rather than individual properties, and courts have refused to invalidate blight determinations with respect to an area merely because single parcels within the area would not be considered blighted if viewed in isolation. *Levin v. Tp. Committee of Tp. of Bridgewater*, 57 N.J. 506, 274 A.2d 1 (1971); *St. Peter's v. Urban Red. Auth. of Pgh.*, 394 Pa. 194, 146 A.2d 724 (1958); *AAAA Enterprises v. River Place*, 74 Ohio App. 3d 170, 598 N.E.2d 711 (1991). See, also, *Oliver v. Clairton*, 374 Pa. 333, 98 A.2d 47 (1953) (holding that area can be blighted even if certain areas will not be developed immediately because purpose of redevelopment statute is to encourage redevelopment of defined areas). We acknowledged this "area rule" in *Monarch Chemical Works, Inc. v. City of Omaha*, 203

Neb. at 41, 277 N.W.2d at 428 (quoting *David Jeffrey Co. v. Milwaukee*, 267 Wis. 559, 66 N.W.2d 362 (1954)), noting that laws such as our CDL are " 'directed against areas, and not individual structures.' " In addition, the U.S. Supreme Court has stated that "community redevelopment programs need not . . . be on a piecemeal basis—lot by lot, building by building." *Berman v. Parker*, 348 U.S. 26, 35, 75 S. Ct. 98, 99 L. Ed. 27 (1954). However, many jurisdictions limit this rule, either through case law or by statute, to situations in which the inclusion of parcels of real estate in a blighted or substandard designation is reasonably necessary to create a unified redevelopment area sufficient to encourage developers. *In re G. & A. Books, Inc.*, 770 F.2d 288 (2d Cir. 1985); *City of Helena v. DeWolf*, 162 Mont. 57, 508 P.2d 122 (1973); *Miller v. City of Tacoma*, 61 Wash. 2d 374, 378 P.2d 464 (1963); *Maryland Plaza Redevelopment v. Greenberg*, 594 S.W.2d 284 (Mo. App. 1979); *Schweig v. City of St. Louis*, 569 S.W.2d 215 (Mo. App. 1978). See, also, 7A Eugene McQuillin, The Law of Municipal Corporations § 24.563.10 at 212 (3d ed. 1998) (stating principle that "land which is itself not substandard or blighted may be included in an urban renewal program where it is necessary for the effective undertaking of the program").

It is undisputed that the 58-acre parcel which included the site of the proposed campground consisted of undeveloped land used exclusively as a cornfield prior to its incorporation in Area 7 in 1994. Hastings' consultant was unable to state that this parcel was itself blighted or substandard within the meaning of the CDL. However, in light of the area rule discussed above, we disagree with the conclusion of the district court that land may not be added to an existing redevelopment area unless the additional land is itself blighted or substandard.

However, the district court also found that "[u]nless necessary to relieve blight or substandard conditions on a specific site the mere incorporation of land into a redevelopment area is not sufficient to qualify the land for a blight or substandard designation." The court found no evidence that the proposed campground development would eliminate any identifiable blight or substandard condition. The CDL does not specifically address the question of the incorporation of territory into an existing

community redevelopment area which has previously been declared blighted or substandard. In order to determine whether this power is fairly implied in or incident to those powers specifically granted under the CDL, we must look at the statutory objective to be accomplished, the problem to be remedied, or the purpose to be served and then place on the statute a reasonable construction which best achieves its purpose, rather than a construction defeating the statutory purpose. *Guzman v. Barth*, 250 Neb. 763, 552 N.W.2d 299 (1996); *In re Interest of Brandy M. et al.*, 250 Neb. 510, 550 N.W.2d 17 (1996); *In re Interest of Aaron K.*, 250 Neb. 489, 550 N.W.2d 13 (1996). In determining the meaning of a statute, an appellate court may conjunctively consider and construe a collection of statutes which pertain to a certain subject matter to determine the intent of the Legislature so that different provisions of the act are consistent, harmonious, and sensible. *Abboud v. Papio-Missouri River NRD*, 253 Neb. 514, 571 N.W.2d 302 (1997); *Snipes v. Sperry Vickers*, 251 Neb. 415, 557 N.W.2d 662 (1997); *McCook Nat. Bank v. Bennett*, 248 Neb. 567, 537 N.W.2d 353 (1995).

The legislative findings and declarations set forth at § 18-2102 establish that the CDL was enacted to enable municipalities to identify and eliminate or rehabilitate substandard or blighted urban areas through appropriate public action and the cooperation and voluntary action of the owners and tenants of property in such areas. The statutory procedures for accomplishing this objective include the following steps: (1) the identification of a community redevelopment area consisting of portions of a city declared to be substandard or blighted in accordance with statutory definitions and in need of redevelopment, (2) the formulation of a redevelopment plan for such area or a redevelopment project within such area, and (3) the implementation of the redevelopment plan through various means including acquisition, sale, leasing, and contracting for redevelopment. §§ 18-2103, 18-2107, and 18-2109. The CDL provides that cities "shall afford maximum opportunity, consistent with the sound needs of the city as a whole, to the rehabilitation or redevelopment of the community redevelopment area by private enterprises." § 18-2104. To that end, the CDL specifically authorizes a CRA "to enter into any contracts necessary to effectuate the purposes

of the [CDL] and to provide grants, loans, or other means of financing to public or private parties in order to accomplish the rehabilitation or redevelopment in accordance with a redevelopment plan." § 18-2107(4). Section 18-2123 provides that undeveloped and vacant land situated within a city but not within a substandard or blighted area may not constitute a redevelopment project under the CDL unless the governing body of the city first determines by resolution that such land "is essential to the proper clearance or redevelopment of substandard or blighted areas or a necessary part of the general community redevelopment program of the city."

Under this statutory scheme, a private development project would be eligible for tax increment financing only if it is included within an area which has previously been declared blighted or substandard and is in furtherance of an existing redevelopment plan for that area. The declaration of property as blighted or substandard is not simply a formality which must be met in order to assist a private developer with tax increment financing; it is the recognition of a specific public purpose which justifies the expenditure of public funds for redevelopment. See *Monarch Chemical Works, Inc. v. City of Omaha*, 203 Neb. 33, 277 N.W.2d 423 (1979). If a private development project is ineligible for tax increment financing because it is located on land which is not blighted or substandard within the meaning of the CDL, it logically follows that eligibility could not be created by simply incorporating the project site into an adjacent area which has been declared blighted or substandard and revising the redevelopment plan for that area to include the project. Such a result would be contrary to the legislative intent underlying the CDL, which is to eliminate blighted and substandard urban areas through a cooperative effort of the public and private sectors, not to aid private developers. We therefore hold that under the CDL, land cannot be added to an existing community redevelopment area unless (1) the additional land is declared blighted or substandard within the meaning of the CDL *or* (2) the additional land is reasonably necessary to accomplish the implementation of the existing redevelopment plan. See *Prudential B. & L. Ass'n v. Urban Renew. & Com. Dev. Ag.*, 464 S.W.2d 629 (Ky. 1971).

As noted previously, it is undisputed that the 58-acre tract which included the proposed campground site was not itself blighted or substandard within the meaning of the CDL. In addition, the district court found that there was "no showing that the proposed development would eliminate any identifiable blight or substandard condition" of Area 7. Indeed, the record contains no evidence that the incorporation of this tract into Area 7 was reasonably necessary to carry out the redevelopment plan for Area 7 as it existed on August 22, 1994, when the Hastings City Council passed the resolution expanding Area 7 to include the campground site. On that date, the redevelopment plan did not specifically include a campground. The original Area 7 did not include any portion of the campground site, and the record contains no facts establishing that the development of the campground was necessary for the elimination of blight and substandard conditions in the original Area 7, pursuant to the original redevelopment plan. While construction and operation of the campground may have been a desirable economic development for Hastings, this factor alone does not justify incorporating the campground site into an existing redevelopment area to permit the use of tax increment financing as an incentive to the developer. For these reasons, we conclude that the district court did not abuse its discretion in holding that the expansion of Area 7 to include the campground site was arbitrary and not supported by sufficient evidence and, accordingly, that the subsequent redevelopment contract with Hultine which authorized the $94,000 grant was invalid and void ab initio.

The judgment of the district court is affirmed.

AFFIRMED.