MELVIN L. RAWLINGS ET AL., APPELLANTS, V. CHICAGO, BUR-LINGTON & QUINCY RAILROAD COMPANY ET AL., APPELLEES.

FILED NOVEMBER 13, 1922.  No. 22101.

State Railway Commission: FINDINGS: REVIEW. On an appeal from an order of the state railway commission, the finding of the com-mission will be given the same effect as the verdict of a jury, and the order will not be reversed unless it is clearly wrong.

APPEAL from the Nebraska State Railway Commission. *Affirmed.*

*A. D. McCandless, Sabin & Vasey* and *Pemberton & O'Keefe,* for appellants.

*Byron Clark, J. L. Root, J. W. Weingarten, C. A. Ma-gaw, T. W. Bockes* and *D. F. Smith, contra.*

Heard before MORRISSEY, C. J., LETTON, ROSE, ALDRICH, DAY and FLANSBURG, JJ.

MORRISSEY, C. J.

The complainants made application to the state railway commission for an order directing defendants to install a connecting track between their respective lines of railroad at one of four designated points between the village of Blue Springs and the city of Wymore. The relief prayed was denied, and complainants have appealed.

A line of the Chicago, Burlington & Quincy Railroad

Company extends from St. Louis, Missouri, by way of
Kansas City and St. Joseph, Missouri, Falls City, Table
Rock, and Wymore, Nebraska, to Denver, Colorado. A
line of the Union Pacific Railroad Company extends from
Kansas City, Missouri, to Lincoln, Nebraska, by way of
Topeka and Manhattan, Kansas, and Beatrice, Nebraska.
The city of Wymore is located in the south central part of
Gage county on the line of the Chicago, Burlington &
Quincy Railroad Company and the village of Blue Springs
is located one mile north of the city of Wymore on the
line of the Union Pacific Railroad Company. The two
lines of railroad intersect 2½ miles east of the Burling-
ton depot at Wymore and run parallel to one another
in a northwesterly direction about one mile. The Bur-
lington line then takes a more westerly direction and
enters the city of Wymore, while the Union Pacific line
takes a more northerly direction and enters the village
of Blue Springs. There is no physical connection be-
tween the two roads either at Wymore, Blue Springs, or
the point of intersection, where cars may be transferred
from one road to the other. The nearest point at which
transfers may be made is the city of Beatrice, 13 miles
distant from the city of Wymore.

Adjacent to the lines of railroad, where they parallel
one another, there is a stone quarry from which is shipped
large quantities of rock in car-load lots varying from 400
to 500 cars a year. Each railroad has a spur track on its
line to handle this freight. The rock to be shipped over
the Union Pacific line is loaded directly from the rock-
crusher to the car by means of a chute. The rock to be
shipped over the Burlington line, because of the absence
of physical connection between the two lines, is hauled
from the chute of the rock-crusher across both lines of
track with teams and put on a dump from which it is
loaded into the cars. The "round trip" for this haul is
approximately 1,500 feet. The testimony shows that the
cost of loading the cars on the Union Pacific track, through
the chute from the rock-crusher, is merely nominal, while

the cost of loading by means of teams on the Burlington line runs from $2 to $4 a car.

The shipments vary from year to year, but during the first nine months of 1918 there were shipped over the Burlington 142 cars, and 130 cars were shipped over the Union Pacific. In the year 1912, 594 cars were shipped over the Burlington. As the record stands it presents a showing of an ice plant on the land of the Union Pacific Railroad Company at Blue Springs which is inconvenienced because of the absence of the physical connection asked. However, the showing as to this industry is not strong, and, since the argument in this court, the owners of the plant have filed in substance a disclaimer of interest in this proceeding.

The Farmers Lumber & Grain Company, doing business at Wymore, complains chiefly of its inability to handle Rock Springs coal which originates on the line of the Union Pacific because of the added freight charge by reason of the shipment having to travel north to Beatrice and thence south to Wymore, or a truck haul from Blue Springs. The testimony on behalf of complainants show an added cost on this coal of approximately $1 a ton, but the testimony on behalf of defendants makes it clear that because of a new rate, of which complainants were not informed, there was in fact a difference of only 30 cents a ton. The quantity of this coal affected is not easy to ascertain. There has been only a small quantity handled by this company, but with the installation of the connection sought, or with the lower rate now in force, the quantity may be increased. Complainants contend that the Farmers Grain & Elevator Company, located on the line of the Union Pacific at Blue Springs, suffers inconvenience and injury to business because of the absence of the connection. However, the testimony of the manager of this company fails to support the claim. At most, his testimony shows that this connection would be of substantial advantage only during the seasons when there is a failure of the corn crop west of his place of business. His testi-

mony is to the effect that, when "there is a scarcity of corn, we would not ship any wheat in that direction, but it might happen, and has happened, that through that territory there might be a chance to ship corn in preference to further south; not very often, but it has happened." The industry chiefly affected is the Rawlings Ice Plant located on the line of the Burlington about 2½ miles west of the proposed connection. The plant has a storage capacity of between 25,000 and 30,000 tons. Mr. Rawlings testified that he shipped about 600 cars of ice during 1917; that at various times he has shipped considerable ice over the Union Pacific lines, and that when shipments are made over that line to points south of Wymore the shipments go north to Beatrice over the Burlington line, where it is transferred to the Union Pacific line, and comes back by way of Blue Springs, practically repassing the point of origin. That in 1918 he thus shipped 33 cars of ice, and that on this shipment he paid $489.94 freight in excess of what it would have cost him had the connection which he here seeks been installed and in operation, except that from the amount stated there should be deducted a small sum for switching charges. He also mentions another shipment of 14 cars which was prejudicially affected because of the lack of the connection sought. Among other shipments pointed out is one of 40 cars sold to the Pacific Fruit Express, a subsidiary company of the defendant Union Pacific Railroad Company. Under his contract of sale he was required to deliver this ice to the purchaser for shipment over the Union Pacific railway and, the nearest point at which he could make the delivery being the city of Beatrice, he was compelled to pay the local freight on this shipment from his plant to that city, amounting to $800.

In 1917 he claims to have lost the sale of 2,000 tons of ice to the same company because he could not profitably make a sale and pay the freight to the point of delivery. On all shipments to the north and west over the Union Pacific lines he has been compelled to pay local freight

over the Burlington line to Beatrice, and it is claimed that this virtually shuts him out from the trade at these points. The railway commission found, and apparently its finding is supported by the evidence, that the interchange of carload traffic at Beatrice from November, 1916, to April, 1920, was approximately 500 cars, and that of this number, had there been a transfer switch at one of the points in question, 50 of these cars would have been there transferred.

As to the shipments of rock, the commission found that the transfer if installed would effect a saving only to the amount of the difference between the cost of loading the cars on the Burlington by wagon and the cost of loading from a chute, less a proper switching charge which it would be the duty of the commission to fix. No evidence was offered from which the cost of this switching charge may be determined, but it is said in the opinion of the commission that "it certainly would not be an appreciable amount less than $4. Therefore, there would not be an appreciable saving to the rock industry if the connection were made." If the conclusion of the commission that the switching charge on rock would be approximately $4 a car, and there is no evidence to indicate a different rate for switching other commodities, we may assume that it would be approximately that rate on ice, coal and grain.

So far as the affirmative proof goes, it shows Mr. Rawlings' sale of ice for shipment over the Union Pacific lines to be made chiefly to a subsidiary company of the defendant Union Pacific Railroad Company, and it is claimed by that company that it has built, or has in process of construction, plants for the manufacture of ice and that it is not likely to remain a purchaser of the Rawlings ice. The main market for the Rawlings ice appears to be along the Burlington lines, and so far as shipments to these points are concerned a transfer switch would be of no service. The statute under which this proceeding is had, section 5379, Comp. St. 1922, provides that the state railway commission has jurisdiction to make such order

as is here prayed, "where the tracks of the two railroad companies are within five hundred feet apart, whether on the same grade or not, where it is practicable and deemed reasonably necessary." Appellants demanded an answer to the two questions: "(1) Is the construction and operation of the proposed transfer switch between the two railroad companies practicable? (2) Is the construction and operation of the proposed switch between the two companies reasonably necessary for the use and benefit of the complainants or either of them or the public?"

It is said that the commission left the first question undetermined, while answering the second in the negative. From a construction standpoint there is little, if any, difficulty to be encountered. A number of different forms of construction are suggested and there is a substantial difference of opinion as to the cost of construction, but it is plain that no serious difficulties would be encountered in the matter of construction alone. It does not follow, however, that such construction is practicable. Indeed, the testimony offered by defendants raises a serious question as to the practicability of the transfer. It would serve no useful purpose to set it out in detail. It may be summarized by saying that it indicates a first cost of construction varying from $2,000 to $8,000 or $10,000. The objections seem to be made not so much to the cost of construction as to other matters. It is claimed that in the practical operation of the roads the cost to the companies would be out of proportion to the revenue derived. The only persons who have testified on this subject were officers and employees of the defendant roads. This testimony is calculated to show that, because the switch, if installed, would be located outside the yard limits of either Wymore or Blue Springs, it would be difficult and expensive to send switching crews to make the necessary transfers; that if switching crews are not sent to make the transfers it will be both difficult and expensive to the carriers to have the work done by the regular train crews;

that the federal safety appliance act requires interstate carriers to inspect cars when transferred from one line to another to make sure that the safety appliances are in order and that this would entail the expense of sending an inspector to overlook the cars transferred; that as the switch would be located at a point far distant from the regular office of either company it would require additional labor and entail unusual expense in the transfer of way-bills. Also, that the transfer tracks being without the city limits of either city the cars of merchandise left upon the tracks would be without police protection.

This testimony is not disputed. After a careful consideration the commission reached the conclusion that the connection prayed was not reasonably necessary. The rule in this state is: "Appeals from the orders of the state railway commission directly to this court, under section 7, ch. 90, Laws 1907, as amended by chapter 94, Laws 1911 (Rev. St. 1913, sec. 6132), are to be considered and determined in the same manner as appeals from a judgment of the district court upon trial by jury in civil cases. Such orders will not be reversed unless it affirmatively appears from the record that they are clearly wrong." *Byington v. Chicago, R. I. & P. R. Co.*, 96 Neb. 584.

When this rule is applied to the evidence submitted, there appears to be no ground for disturbing the finding of the commission, and it is

AFFIRMED.