HAROLD BOWMAN AND DONNA BOWMAN, HUSBAND AND WIFE, APPELLEES AND CROSS-APPELLEES, V. CITY OF YORK ET AL., APPELLEES AND CROSS-APPELLANTS, AND YORK COLD STORAGE COMPANY, INC., INTERVENOR-APPELLANT.

482 N.W.2d 537

Filed March 13, 1992.   No. S-89-826.

Robert T. Grimit and Gail S. Perry, of Baylor, Evnen, Curtiss, Grimit & Witt, for intervenor-appellant.

Rex R. Schultze, of Perry, Guthery, Haase & Gessford, P.C., for appellees Bowman.

Vincent Valentino, of Angle, Murphy, Valentino & Campbell, P.C., for appellees City of York et al.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

CAPORALE, J.

# I. INTRODUCTION

The City of York, an appellee in this court, through its board of adjustment, granted a zoning variance to York Cold Storage Company, Inc. The abutting property owners, Harold Bowman and his wife, Donna Bowman, also appellees in this court, challenged the board's decision in the district court. That court reversed the grant of the variance and ordered York Cold Storage to tear down the portion of the structure erected in accordance with the variance. York Cold Storage, which had intervened in the district court, then appealed to this court, assigning as errors the district court's (1) finding that the variance was granted illegally, (2) failure to find that the Bowmans had waived their right to challenge the variance, (3) failure to find that York Cold Storage had detrimentally relied in good faith on the variance and thus had a vested right to use its property in accordance therewith, and (4) order to remove the offending portion of the structure. The City of York cross-appealed, joining in appellant York Cold Storage's claim that the district court erred in finding that the variance was granted illegally and adding the assertion that the district court erred in permitting an expert witness to testify. We affirm.

# II. FACTUAL AND PROCEDURAL BACKGROUND

The Bowmans purchased realty abutting to the east of the realty owned by York Cold Storage. At the time of the Bowman purchase, both pieces of abutting property were zoned residential.

In April 1987, York Cold Storage applied to have its property zoned to permit heavy industrial use. Following a public hearing, the planning commission of the City of York recommended approval of the zoning change notwithstanding the Bowmans' objection. The City of York then amended its zoning ordinance in accordance with the commission's recommendation.

York Cold Storage next applied for a permit authorizing it to build a warehouse on its property such that its 30-foot high rear wall would be within 1 foot of the line dividing its property from that of the Bowmans. However, the heavy-industrial-use

zoning designation requires a 15-foot rear yard building setback when the property abuts a residential zone. Accordingly, York Cold Storage requested a 14-foot variance from the required rear setback.

Neb. Rev. Stat. § 19-910 (Reissue 1987) provides that a board of adjustment shall have the power,

> where by reason of exceptional narrowness, shallowness, or shape of a specific piece of property at the time of the enactment of the zoning regulations, or by reason of exceptional topographic conditions or other extraordinary and exceptional situation or condition of such piece of property, the strict application of any enacted regulation . . . would result in peculiar and exceptional practical difficulties to or exceptional and undue hardships upon the owner of such property, to authorize, upon an appeal relating to the property, a variance from such strict application so as to relieve such difficulties or hardship, if such relief may be granted without substantial detriment to the public good and without substantially impairing the intent and purpose of any ordinance or resolution.

Section 19-910 further provides:

> No such variance shall be authorized by the board unless it finds that: (a) The strict application of the zoning regulation would produce undue hardship; (b) such hardship is not shared generally by other properties in the same zoning district and the same vicinity; (c) the authorization of such variance will not be of substantial detriment to adjacent property and the character of the district will not be changed by the granting of the variance; and (d) the granting of such variance is based upon reason of demonstrable and exceptional hardship as distinguished from variations for purposes of convenience, profit or caprice.

The foregoing criteria are also found in the York Code of Ordinances, app. A, art. XXVII, § 10 (1986).

At the hearing before the board, a vice president and director of York Cold Storage, Roger Sack, testified:

> Our hardship is potentially financial. But I don't want to

really dwell on that because I think in the broader sense the only representation we can make and we have a past history to back it up, is that the intent of this project is to lead to a substantial increase in local employment. It is not guaranteed but this sure won't happen without it. We have a substantial prospect for a materially large facility coming in to utilize this building which we cannot get unless we build it up first to prove it. So if we want to talk about adversity it is more along the lines of broader community risk. But going to negotiation is one thing or another - it isn't really the sort of thing that we can come right out and sit down and tell stories the way we would like to about exactly who we are talking to and what they are saying. But we do want to make the representation that we think the project will not only be a substantial benefit to the community not the least of which is $5,000 of [sic] $6,000 a year in taxes instead of $35 . . . . So the adversity I could recite that in dollars but I think it might be inappropriate and it may be technically irrelevant in terms of our own direct situation but I can guarantee you that it would be adverse to the community.

Sack conceded, however, that "it would be mechanically as easy to build the building farther west thereby utilizing the 15 foot setback, however, the building would have to be smaller and that is against the interests of the people who are banging us on the head to provide this facility." He also said:

With regard to moving it to another location, one of the economies that have these people interested in coming to town has to do with its association mechanically with the Cold Storage Co. The existing engine room facility can be connected by overhead piping to the facility. If this were built as a free standing affair, as we have seen in the past, not only the construction itself may not be more expensive but the site costs, the approach costs, streets, the stuff that don't exist, independent engine room and operationally a separate staff with separate supervisory force a couple of miles away for example where we own property up north would be economically in that regard a substantial hardship and may damage the economics of it to the point

to where the pricing we would have to do to recoop [sic] that extra cost would sort of make our people take a walk.

The Bowmans countered that permitting York Cold Storage to construct the facility within a foot of their lot line would injure them by damaging their garden and fruit trees, interfering with the draft necessary for their woodburning stove, reducing the amount of air circulation and sunlight their property would receive, and creating noise from the "running units on top of the building."

On June 2, 1987, the board unanimously voted to grant York Cold Storage the requested variance. On June 16, 1987, the Bowmans filed their appeal to the district court and gave notice thereof to York Cold Storage the following day. York Cold Storage commenced construction of its warehouse on June 23, 1987.

At the hearing which followed, the district court received additional evidence in accordance with Neb. Rev. Stat. § 19-912 (Reissue 1987), which provides that if, upon the district court hearing,

it shall appear to the court that testimony is necessary for the proper disposition of the matter, it may take evidence or appoint a referee to take such evidence as it may direct and report the same to the court with his findings of fact and conclusions of law, which shall constitute a part of the proceedings upon which the determination of the court shall be made.

Upon questioning by the Bowmans, the district court heard Sack explain York Cold Storage's decision to proceed with construction notwithstanding the appeal, as follows:

Q. . . . . The question was, you then assumed the risk of going ahead with construction, based on your business decision in the face of the appeal?

[Sack]. That's correct.

Q. And the risk you assumed was, was that the variance would be overturned, isn't that right?

[Sack]. That's right.

Q. And you made that decision because there were profits to be made from this new client — or old client that was expanding its business with you, isn't that correct?

[Sack]. It was to avoid the loss of losing them.

Q. So basically, it was a money decision, is that right?—To avoid money losses, is that correct?

[Sack]. To proceed with the construction?

Q. Right.

[Sack]. That's correct.

Q. And it was also — I think you also indicated that by proceeding with construction, you would increase your profits, is that also correct?

[Sack]. We had hoped so, yes.

The record further reveals that after the warehouse was built, York Cold Storage added a total of two employees, whose duties are not disclosed, and that the warehouse produces gross revenues of $25,000 per month. Since the building was completed in October 1987, it has thus far produced approximately $1.3 million in such revenues. The cost to physically tear down the offending 14 feet is calculated to be approximately $15,000 and would cause the elimination of the two employees added to York Cold Storage's prior work force.

The district court also received the opinion of a real estate appraiser that the variance diminishes the value of the Bowmans' property by approximately $1,500.

### III. SCOPES OF REVIEW

Before proceeding further, we must settle upon the scope of the district court's and our review. *Frank v. Russell*, 160 Neb. 354, 363, 70 N.W.2d 306, 312 (1955), holds that the decision of a board of adjustment granting a variance from the provisions of a zoning ordinance will not be disturbed on appeal unless the decision "is found to be illegal or from the standpoint of fact it is not supported by evidence, or is arbitrary and unreasonable, or is clearly wrong."

This same standard was reiterated in *Weber v. City of Grand Island*, 165 Neb. 827, 87 N.W.2d 575 (1958). But *Weber* also states:

> "In appeals from the district court to the supreme court in suits in equity, on trial de novo this court will retry the issue or issues of fact involved and reach an independent conclusion as to what findings are required under the

pleadings and the evidence, without reference to the conclusion reached in the district court." Also, as said in that opinion: "The question of the validity or invalidity of a zoning ordinance presents a question to be determined on examination of the facts in each particular case presented. On this proposition the law is well settled."
*Id*. at 830-31, 87 N.W.2d at 578.

*Weber*, however, was concerned not with a variance but with a situation in which the city council had met as a board of adjustment and heard evidence relating to a request for rezoning. According to the *Weber* opinion, this action was authorized by then § 19-910 (Reissue 1954). Nonetheless, we find nothing in § 19-910 as it then existed which authorized a board of adjustment to participate in any rezoning activity. That statute empowered boards of adjustment to (1) hear appeals from decisions of an administrative official, (2) hear and decide special exemptions to the terms of ordinances, and (3) authorize variances from the terms of an ordinance. In any event, the *Weber* court examined the board's actions in light of the evidence it received and concluded that the board's action in permitting the rezoning and the city's enactment of an ordinance to enforce it were both invalid.

It is also worth noting that the *Weber* opinion cites no source for the scope of review language it appears to quote. While the *Weber* opinion contains two quotations from *Dundee Realty Co. v. City of Omaha*, 144 Neb. 448, 13 N.W.2d 634 (1944), the scope of review language does not appear therein. The Supreme Court treated *Dundee*, in which the plaintiff unsuccessfully claimed a zoning ordinance adopted by the city council was unconstitutional, as one in equity to be reviewed de novo.

More recently, *Mossman v. City of Columbus*, 234 Neb. 78, 449 N.W.2d 214 (1989), relying on *McClelland v. Zoning Bd. of Appeals*, 232 Neb. 711, 441 N.W.2d 893 (1989), declared that the actions of zoning boards of adjustment are judicial in nature and are subject to review and reversal when they constitute an abuse of discretion and are arbitrary. However, *McClelland* dealt with the order of a zoning board of appeals, an entity created by a different statute than the one which brings boards of adjustment into being. See Neb. Rev. Stat. §§ 14-409

and 19-910 (Reissue 1987).

Given that history, further study is necessary. Section 19-912 provides that a person aggrieved by a decision of a board of adjustment may appeal to the district court on the ground that the decision "is illegal, in whole or in part" and that the appellant must "[specify] the grounds of such illegality."

As noted in part II, § 19-912 also authorizes, but does not require, the district court to take additional evidence. Provisions which allow the taking of additional evidence have been construed by some courts as authorizing a de novo proceeding in the trial court. See, *Whitcomb v. City of Woodward*, 616 P.2d 455 (Okla. App. 1980); *Thayer et ux. v. Lower Milford Twp. et al.*, 16 Pa. Commw. 124, 343 A.2d 92 (1974).

Other courts, however, have determined that the power to hear additional evidence does not authorize a de novo review but, rather, that the additional evidence is to be used in deciding whether the board abused its discretion. See, *Shaw v. City of Manchester*, 120 N.H. 529, 419 A.2d 394 (1980); *Rickard v. Fundenberger*, 1 Kan. App. 2d 222, 563 P.2d 1069 (1977); *Blum v. McGraw*, 92 Misc. 2d 781, 401 N.Y.S.2d 127 (1977).

An administrative agency has been said to be "a governmental authority, other than a court and other than a legislative body, which affects the rights of private parties through either adjudication or rulemaking." 1 Kenneth C. Davis, Administrative Law Treatise § 1:2 at 9 (2d ed. 1978). Under that definition, boards of adjustment function primarily as administrative agencies. See *Florentine v. Darien*, 142 Conn. 415, 115 A.2d 328 (1955) (zoning board which has power to apply zoning regulations is primarily an administrative agency). See, also, *Rogoff v. Tufariello*, 106 N.J. Super. 303, 255 A.2d 781 (1969); *Lee v. Board of Adjustment*, 226 N.C. 107, 37 S.E.2d 128 (1946); *McCord v. Ed Bond & Condon Co.*, 175 Ga. 667, 165 S.E. 590 (1932).

The powers of administrative agencies were well described in *Dep't of Nat. Res. v. Linchester*, 274 Md. 211, 222, 334 A.2d 514, 522 (1975):

> The primary function of administrative agencies is to advance the will and weal of the people as ordained by

their representatives — the Legislature. These agencies are created in order to perform activities which the Legislature deems desirable and necessary to forward the health, safety, welfare and morals of the citizens of this State. While these agencies at times perform some activities which are legislative in nature and thus have been dubbed as quasi-legislative duties, they in addition take on a judicial coloring in that frequently, within the exercise of their power, they are called upon to make factual determinations and thus adjudicate, and it is in that sense that they are also recurrently considered to be acting in a quasi-judicial capacity. This dual role which administrative agencies play has long been accepted in this State as being constitutionally permissible. [Citations omitted.] However, this authority is not the same and, therefore, is distinguishable from the exercising of the "judicial powers" of this State . . . .

And as recently stated in *Bentley v. Chastain*, 242 Ga. 348, 350-51, 249 S.E.2d 38, 40 (1978):

Whether operating in the federal, state, or local sphere, agencies provide a high level of expertise and an opportunity for specialization unavailable in the judicial or legislative branches. They are able to use these skills, along with the policy mandate and discretion entrusted to them by the legislature, to make rules and enforce them in fashioning solutions to very complex problems. Thus, their decisions are not to be taken lightly or minimized by the judiciary. Review overbroad in scope would have the effect of substituting the judgment of a judge or jury for that of the agency, thereby nullifying the benefits of legislative delegation to a specialized body.

The considerations discussed in the foregoing two cases, coupled with the fact that § 19-912 permits an appeal to the district court only on the ground that a board of adjustment's decision is illegal, lead us to conclude that a district court may disturb a decision of such a board only if, as suggested in *Frank v. Russell*, 160 Neb. 354, 70 N.W.2d 306 (1955), and *Mossman v. City of Columbus*, 234 Neb. 78, 449 N.W.2d 214 (1989), the decision was illegal or is not supported by the evidence and is

thus arbitrary, unreasonable, or clearly wrong. In deciding whether a board's decision is supported by the evidence, the district court shall consider any additional evidence it receives. See, e.g., *Demarest v. Mayor & Council of Bor. of Hillsdale*, 158 N.J. Super. 507, 386 A.2d 875 (1978); *Richman v. Zoning Bd. of Adj.*, 391 Pa. 254, 137 A.2d 280 (1958).

That brings us to the question of what it is this court is to review and by what standard it is to be judged. In *Frank v. Russell*, this court, relying on cases appealed from the Nebraska State Railway Commission, reviewed the decision of a board of adjustment. The distinction between railway commission reviews and board of adjustment reviews is that appeals from the railway commission were directly to this court, e.g., *Rawlings v. Chicago, B. & Q. R. Co.*, 109 Neb. 167, 190 N.W. 569 (1922), whereas appeals from boards of adjustment are first reviewed by the district court, § 19-912.

We therefore now hold that an appellate court reviews the decision of the district court and that irrespective of whether the district court took additional evidence, the appellate court is to decide if, in reviewing a decision of a board of adjustment, the district court abused its discretion or made an error of law. Where competent evidence supports the district court's factual findings, the appellate court will not substitute its factual findings for those of the district court. See, *Lambros v. Missoula*, 153 Mont. 20, 452 P.2d 398 (1969); *Estate of Barbagallo v. Zoning Hear. Bd.*, 133 Pa. Commw. 38, 574 A.2d 1171 (1990).

### IV. ANALYSIS OF APPEAL

Having settled upon the scope of our review, we now proceed to a consideration of the errors York Cold Storage has assigned.

#### 1. ILLEGALITY OF VARIANCE

*Frank v. Russell* is instructive on the question of the circumstances under which a board of adjustment may grant a zoning variance. In *Frank*, the defendants had applied for and obtained a variance from a zoning ordinance which required a front yard setback of 40 feet from the lot line. The variance permitted construction within 27 feet of the line. The plaintiffs, who lived in the same block as the defendants, argued that as all

other homes on the block had a front yard setback of 40 feet, a house constructed 13 feet closer to the lot line would obstruct their view, interfere with the enjoyment of their home, and depreciate the value of their property. The district court affirmed the grant of the variance. This court reversed for the reasons that no substantial hardship to the applicant had been shown but that injury to other property owners had, in that the variance destroyed the symmetry of the block and interfered with the views of other property owners.

In so ruling, the *Frank* court stated:

It appears that the rule respecting the right of a board of adjustment, such as the one here, to grant a variance from zoning regulations on the ground of unnecessary hardship is generally that it may not be granted: Unless the denial would constitute an unnecessary and unjust invasion of the right of property; if the grant relates to a condition or situation special and peculiar to the applicant; if it relates only to a financial situation or hardship to the applicant; if the hardship is based on a condition created by the applicant; if the hardship was intentionally created by the owner; if the variation would be in derogation of the spirit, intent, purpose, or general plan of the zoning ordinance; if the variation would affect adversely or injure or result in injustice to others; or ordinarily if the applicant purchased his premises after enactment of the ordinance.

160 Neb. at 362-63, 70 N.W.2d at 312.

It is worth observing that at the time *Frank* was decided, § 19-910 did not enumerate the criteria one applying for a variance had to meet, other than to show that a literal enforcement of the ordinance would result in unnecessary hardship and that the requested variance was not contrary to public policy. It is apparent that much of what is now in § 19-910 comes from *Frank*.

In any event, so far as is relevant to this case, § 19-910 and the code of the City of York now empower a board of adjustment to grant a variance from a zoning regulation only if strict application of the regulation, because of the unusual physical characteristics of the property existing at the time of

the enactment, "would result in peculiar and exceptional practical difficulties to or exceptional and undue hardships upon the owner . . . ." § 19-910. Both the statute and the code define undue hardship as a "demonstrable and exceptional hardship as distinguished from variations for purposes of convenience, profit or caprice."

The evidence establishes that the setback requirement at issue was part of the rezoning designation York Cold Storage wanted and obtained. There is no evidence that the physical characteristics of York Cold Storage's property were, at that or at any other time, such that strict application of the setback requirement would produce undue hardship for it.

Indeed, Sack's testimony establishes that York Cold Storage wanted relief from the requirement solely in order that it might maximize its profits. Although that is certainly an understandable, and even laudable, goal, it does not provide a basis for riding roughshod over the rights of others by obtaining a variance from zoning regulations with which the rest of the community must live. As said in *Frank v. Russell*, 160 Neb. at 361, 70 N.W.2d at 311, quoting Annot., 168 A.L.R. 30 (1947): " '[T]he financial situation or pecuniary hardship of a single owner affords no adequate grounds for putting forth this extraordinary power affecting other property owners as well as the public.' "

Nor is the situation changed, as York Cold Storage argues, by the fact that its ability to build a larger facility enables it to augment its work force and thus benefit the community at large. A business which expands its facilities will generally require additional employees; if the need or desire for expansion alone were to justify a variance, zoning regulations would be meaningless.

Having determined that York Cold Storage failed to establish that strict application of the setback requirement would have produced undue hardship for it, we do not need to consider whether it met the other criteria for a variance.

Accordingly, the district court neither made an error of law nor abused its discretion in concluding that the variance was granted illegally.

## 2. CLAIMED WAIVER OF CHALLENGE

York Cold Storage next contends that the district court erred in failing to find that the Bowmans waived "their right to challenge the decision of the Board of Adjustment by their failure to seek injunctive relief to stop construction." Section 19-912 provides that on appeal, "the district court shall not stay proceedings upon the decision appealed from, but the court may, on application, on notice to the board and on due cause shown, grant a restraining order."

York Cold Storage in effect argues that the foregoing statute places upon one who wishes to challenge the grant of a variance an affirmative duty not only to appeal but to also seek and obtain a restraining order pending the outcome of the appeal.

"Waiver" is a voluntary and intentional relinquishment of a known, existing legal right or conduct from which such relinquishment can be inferred. *Stuhr v. Stuhr, post* p. 239, 481 N.W.2d 212 (1992); *Licht v. Association Servs., Inc.*, 236 Neb. 616, 463 N.W.2d 566 (1990). To establish the waiver of a legal right, there must be clear, unequivocal, and decisive action of the party showing such purpose, or acts which amount to an estoppel. See *Jelsma v. Scottsdale Ins. Co.*, 231 Neb. 657, 437 N.W.2d 778 (1989). The Bowmans took no action which can be said to have clearly and unequivocally demonstrated a knowing relinquishment of the right to challenge the variance nor such as to estop them from so doing.

The very opposite is true; they filed their appeal and promptly gave York Cold Storage notice that they had done so. York Cold Storage simply made a business decision to take the risk of construction, knowing that the grant of the variance was being challenged and might be reversed.

There is nothing in § 19-912 which requires one to either seek and obtain a restraining order or forgo any challenge to a variance. On the contrary, the statute merely provides that a challenger who wishes to incur the cost of obtaining a restraining order may do so in order to temporarily protect himself from the consequences of the variance during the pendency of the appeal.

In so holding, we are not unmindful of *Zoning Bd. of Adjustment v. DeVilbiss*, 729 P.2d 353 (Colo. 1986), which

holds that the failure of one challenging a zoning variance to obtain a temporary injunction pending the outcome of an appeal renders the cause moot. The problem with this approach, however, is that it encourages the disregard of legal challenges and promotes construction which may subsequently be found to be in violation of an erroneously waived zoning regulation. In this regard, we consider the reasoning in *Bat'tles v. Board of Adjustment and Appeals*, 711 S.W.2d 297 (Tex. App. 1986), to be sounder. The *Bat'tles* court rejected the notion that the failure to obtain a restraining order or to file a supersedeas bond renders the cause moot. That court concluded that as the statute concerning the grant or denial of a variance was silent on whether a bond or restraining order was required, the general law of civil suits applied, and that law does not require a losing plaintiff to seek a bond or a restraining order.

We therefore reject the *De Vilbiss* approach and hold that just as a plaintiff who collects a judgment which is appealed but is not superseded takes the risk of having to make restitution, *Ohio Cas. Ins. Co. v. Gantt*, 256 Ala. 262, 54 So. 2d 595 (1951), so, too, does one who builds in accordance with a zoning variance which is appealed take the risk that it will have to tear down what it has built.

### 3. EFFECT OF RELIANCE

In an extension of the position it took in the preceding part IV(2), York Cold Storage also urges that the district court erred in reversing the variance because York Cold Storage had, in good faith, detrimentally relied on the grant.

In attempting to distinguish its situation from that presented in *Omaha Fish & Wildlife v. Community Refuse*, 213 Neb. 234, 329 N.W.2d 335 (1983), York Cold Storage argues that as it had made expenditures in constructing the building in good faith reliance on the variance, the variance cannot now be revoked.

Relying on *A. C. Nelsen Enterprises, Inc. v. Cook*, 188 Neb. 184, 195 N.W.2d 759 (1972), *Omaha Fish & Wildlife* suggests that under certain circumstances the expenditure of funds in good faith reliance on an improper zoning may give rise to a vested right for a certain use of the improperly zoned property.

Nonetheless, the *Omaha Fish & Wildlife* court found that the expenditures at issue had not been made in good faith because at the time they were made, the defendants were aware that the correctness of the zoning was in question.

The *Nelsen* court allowed the grantee of a certificate of occupancy the use of the property in accordance with a permit issued but later withdrawn by the city on the ground it had made an error. In that circumstance, the *Nelsen* court held that the grantee's expenditures in good faith reliance upon the certificate prevented the city from later withdrawing it.

Here, York Cold Storage knew for almost a week before it began construction that the variance under which it was proceeding faced a court challenge. Any expenditures it made under that circumstance cannot be said to have been made in good faith reliance on the variance. In the words of the district court, "Economic might under a guise of claimed good faith detrimental reliance cannot replace or change due process of law." See, also, *Egan v. Catholic Bishop*, 219 Neb. 365, 363 N.W.2d 380 (1985) (purchaser who knew of construction on adjacent property waived any right he may have had to enforce restriction prohibiting such construction).

### 4. REMOVAL ORDER

In a further extension of the positions taken in parts IV(2) and IV(3), York Cold Storage contends that in any event, the district court's order of removal "exceeds the scope of the action and pleadings as well as the statutory authority and jurisdiction of the court." Brief for appellant at 34. Its argument in this regard is threefold: (a) York Cold Storage was an intervenor and, as such, was "not a proper party against whom relief can be granted," *id.*; (b) Neb. Rev. Stat. § 19-909 (Reissue 1987), upon which the Bowmans rely, does not authorize such relief; and (c) the Bowmans did not ask for mandatory injunctive relief.

### (a) Role of Intervenor

York Cold Storage first argues that as an intervenor it was not a proper party against whom relief could be granted. On the contrary, the direct and immediate interest which requires the granting of a motion for leave to intervene is such an interest

that the one seeking to intervene will either lose or gain by the direct application of the judgment. *Basin Elec. Power Co-op v. Little Blue N.R.D.*, 219 Neb. 372, 363 N.W.2d 500 (1985). Under York Cold Storage's reasoning, a party would be allowed to enter the litigation, but would have to accept the judgment only if it were to its liking. That is patent nonsense.

### (b) Statutory Authority

York Cold Storage next urges that in praying for " 'all relief that they are entitled to under the provision of . . . §19-909,' " brief for appellant at 34, the Bowmans invoked no statute authorizing a mandatory injunction. It is true that § 19-909 provides for appeals of certain municipal decisions to a board of adjustment and has no relevance to the matters now before us. However, we have said the prayer of a petition is not a part of the allegations of fact constituting the cause of action; thus, where the facts alleged state a cause of action and are supported by the evidence, the court will grant proper relief, although it may not conform to the relief requested. See, *Waite v. Samson Dev. Co.*, 217 Neb. 403, 348 N.W.2d 883 (1984); *Standard Reliance Ins. Co. v. Schoenthal*, 171 Neb. 490, 106 N.W.2d 704 (1960).

One of the issues in *State Bldgs. Div. v. Town of Castleton Bd. Adj.*, 138 Vt. 250, 415 A.2d 188 (1980), was whether the trial court could grant declaratory and injunctive relief in an appeal from the board of adjustments. The *Castleton* court stated:

> Although jurisdiction will not attach unless a proper appeal is commenced, this Court has affirmed a judgment order granting injunctive relief in which an action denominated as an appeal and a petition for injunctive relief, filed with the board of adjustment and the superior court respectively, were consolidated for disposition below. [Citation omitted.] Thus, it is apparent that if an appeal is properly commenced, the superior court can grant declaratory and injunctive relief in conjunction with its de novo hearing.

*Id.* at 255-56, 415 A.2d at 192.

The *Castleton* court then held that the trial court could

"grant such relief as is otherwise within its jurisdiction and consistent with law and equity." *Id.* at 256, 415 A.2d at 192. This reasoning is sound, for to limit the district court's authority to merely reversing the board's grant of the variance would be to award one successfully challenging the action of a board of adjustment a hollow victory, compelling the successful challenger to file a separate action in order to obtain effective relief from the illegally granted variance. Not only would the rule urged by York Cold Storage unnecessarily delay resolution of the matter and further encumber the courts, it would defy common sense and logic.

### (c) Relief Requested

York Cold Storage finally claims that even if there is statutory authority for mandatory injunctive relief, the Bowmans did not specifically request such relief; thus, the district court was without the power to grant it. The initial petition was filed before the building was constructed; consequently, there was no reason to pray for an order to remove a building which did not exist. At the time the amended petitions were filed, York Cold Storage had not yet intervened; therefore, there was then no one who might be directed to remove a portion of the building. Once York Cold Storage intervened, removal of the offending portion of the structure was an obvious object of the litigation, and, as we have seen, the facts alleged and proved entitle the Bowmans to the mandatory injunctive relief ordered.

### V. ANALYSIS OF CROSS-APPEAL

The City of York's first claim in its cross-appeal, that the district court erred in finding the variance was illegally granted, was adjudicated adversely to it in part IV(1). Accordingly, the City of York's assertion that the district court also erred in receiving the opinion of the Bowmans' appraiser because it was not adequately revealed in the Bowmans' answer to interrogatories is immaterial, as the question of any detriment to the Bowmans' property never arises.

### VI. RULING

Because the record fails to sustain any of the errors assigned

by York Cold Storage or the City of York, the judgment of the district court, as first said in part I, is affirmed.

AFFIRMED.